PENGAD 800-631-6989 Gonzalez DEPOSITION EXHIBIT 21

All Star Works, Inc. March 22, 2001

Progress Inspection Report: 491-5463-Mosile

Met with Mr. Alex Soto at his place of business. He accompanied us to four different sites under construction. The following is an accounting of what we observed:

1. Los Indios Bridge:

| Items | Complete | |
|---|---|---|
| a. Design | 100% | |
| b. Bonds | 100% | |
| c. Concrete | 100% | |
| d. Steel Framing | 100% | 50000 |
| e. Steel Roofing | 0% | 5000 |
| f. Booth | 50% | 5000 |
| g. Painting | 50% | 5000 |
| h. Electrical | 25% | 5000 |
| i. Lighting | 0% | 5000 |
| | | 25,000 |

Mr. Soto will still bill approximately $50,000

Will get 25% of bond ($85,000) $21,250

How much money does he need to finish this project: $25,000.00 20,000

Net Profit $________

Target Date for completion (60 days)

2. Los Tomates Bridge:

| Items | Completion | |
|---|---|---|
| a. Design | 100% | |
| b. Bonds | 100% | |
| c. Concrete | 100% | |
| d. Steel Framing | 50% Purchased only | 10000 |
| e. Steel Roofing | 0% | 15000 |
| f. Booth | 50% Purchased only | 5000 |
| g. Painting | 0% | 10000 |
| h. Electrical | 0% | 10000 |
| i. Lighting | 0% | 10000 |
| | | 60,000 |

Mr. Soto will still bill approximately $80,000

Will get 25% of bond ($85,000) $21,250

How much money does he need to finish this project: $60,000.00 45000

Net Profit $________

Target Date for completion (90 days)

MNB
Mercedes
National Ba

Bill Mynatt
phone:
317-298 1180

Fax:

317-298-1344

**Aaron (Ronnie) Gonzalez**
Executive Vice President

June 6, 2001

U.S. Customs Services –RPC
6026 Lakeside Boulevard
Indianapolis, Indiana 46278

REF: Contracts # TC-1-96-013

CS-1-99-24748-8
CS-1-99-24749-6
CS-1-99-25600-1
CS-1-99-24747-0

ATTN: William Mynatt
ACO PFSG
U.S. Customs

Please make referenced to enclosed Notice of Assignment date January 14, 2000. In this notice the government had agreed that all payments due or to become due on above contracts would be made to the Assignee, Mercedes National Bank. We have seen copies of several checks that have been made directly to All Star Iron Works. At a minimum, checks should be made jointly to our Bank.

Please call us and inform us why this agreement has not been complied with. Mr. Soto has been a customer of our bank for several years, but the fact that these jobs have had numerous change orders and have gone beyond the projected time of completion does concern us.

Please call me so that we can discuss this matter. We would like to know if your agency is paying some of the sub-contractors directly. This will definitely have an impact on how we structure any future advances.

Your prompt and courteous attention to this matter would be greatly appreciated. We do not want to interrupt the normal progress of work to complete these contracts.

Sincerely,

Aaron R. Gonzalez
Executive Vice President

APP 062

PENGAD 800-631-6989
Gonzalez
DEPOSITION EXHIBIT
5

# *ACE COURT REPORTING SERVICE*

***& Digital Videography***

***Statewide & Nationwide Scheduling***

***ORAL DEPOSITION OF***

***Aaron Gonzalez***

***Taken on March 25, 2008***

***Cause No. 07-00355C; Texas National Bank f/k/a Mercedes National Bank v. United States; in the United States Court of Federal Claims***

COPY

*Ace Court Reporting Service*
*& Digital Videography*
*Leideker Building*
*200 E. Cano*
*Edinburg, Texas 78539*
*Firm Registration No. 476*
*Expiration Date: 12/31/09*
*(956)380-1100*
*Fax: (866) 380-1135*
*www.acecourtreporting.com*
*info@acecourtreporting.com*

A. No, I was not working with her.
Q. Were you still involved with All Star loan file?
A. As of that date, no.
Q. To tie it all together, after you wrote the letter -- after you responded to the government's July 4th, 2001 letter and, well, I guess you didn't provide the electronic fund transfer information but you saw that that was done; is that correct?
A. That's correct.
Q. Am I correct, is it your testimony that you had no further personal involvement in collecting the money owed to the bank under the assignment?
A. I believe I made an inspection of the properties but I can't recall what date it was.
Q. Why would you have done that?
A. Just to confirm or try to verify what, what completion of work had actually been done, but in the absence of having the change orders which we did not have.
(Exhibit marked for identification as Deposition Exhibit Number 21.)
Q (By Ms. Stentiford) Can you tell me what Exhibit 21 is?
A. Is this a complete report or.
Q. It's what I was provided by your counsel that apparently that's what's in the bank's file. Is this your

report?

A. It could have been, but I'm sure I would have signed it.

Q. Is March 22nd, 2001, consistent with your recollection of when you would have made a visit to the site?

A. Yes.

Q. It appears this is not complete because it deals with two of the projects and there were four?

A. Right.

Q. Do you have a personal file this report might still be in?

A. No.

Q. What was the purpose of you visiting the job site?

A. It's standard procedure that we visit the sites that we're funding and I would have gone out to make an inspection to see what, based on the initial contracts, to see what we had actually completed.

Q. What will that tell you in connection with getting the bank paid under the assignment?

A. It was marked to see whether the bank had advanced properly based on completion of work.

Q. So you say that was standard practice in connection with any, in any commercial loan, not

necessarily a loan that was being paid through an assignment; is that right?

A. That's correct.

Q. Was that the first visit you made?

A. It appears like it was, and that's around the time that I got involved with the file.

Q. Okay. Did you -- you met with Mr. Soto right there. It says there. Did you on this meeting reflected on March 22nd page of your report, do you remember what you talked about?

A. With Mr. Soto?

Q. Yes, with Mr. Soto?

A. It says that we went to four different sites and there's only two, an accounting of two.

Q. Right. Appears to be an incomplete document?

A. Right.

Q. But it says you do remember meeting with Mr. Soto on or about March 22nd?

A. Yes.

Q. Was that the purpose of that to discuss the outstanding balance of All Star's loan?

A. Yes. Well, the outstanding completion of work, not necessarily his loan at the bank. We were looking at the completion of work in place for the four different contracts he had with the bank.

APP 066

My recollection of that meeting was that there were several additional change orders that he was going to provide the bank and that doesn't, it's not specified in here.
Q. Okay. And change orders that Mr. Soto would have gotten from the government --
A. Correct. Yes.
Q. -- to cause additional or at least different work from the original task orders?
A. Additional expenses, yes.
Q. Additional expense. In other words, All Star would have been entitled to additional payment from the government based on the change orders?
A. Yes.
Q. At least that was your understanding?
A. That was my understanding.
Q. And is it still your understanding the bank hasn't received those change orders?
A. No, not to my knowledge.
Q. Okay. So what's the connection between this, the visit you made on March 22nd to see the completion of work and the letter you wrote ultimately on June 6th, 2001, that we've marked as Exhibit 5, I think?
A. Well, the fact that he had already performed some of the work and we hadn't seen any of the payments.

Q. All right. At this March 22nd meeting you learned apparently All Star had received partial payments, progress payments?
A. I was not sure on that.
Q. Okay.
A. What I was sure is that some of the work had been complete.
Q. Okay. And so being completed, would it be -- would it be fair statement that you concluded All Star was at least entitled to be paid for that?
A. Correct.
Q. And did you later determine that, in fact, it had been paid for that work?
A. I've never made that determination, no.
Q. If All Star had, in fact, received a progress payment for work completed under the four task orders that were in the assignment that money, those payments rightfully belong to the bank pursuant to the terms of the assignment, correct?
A. That's correct.
Q. So if it were determined that progress payments had been paid to All Star, the bank's conclusion would be that money really was rightfully the bank's?
A. Correct.
MS. STENTIFORD: Thank you, Mr. Gonzalez.

Subj: **URGENT/PLEASE RESPOND**
Date: 6/6/01 2:06:51 PM Pacific Daylight Time
From: MNBTX777
To: WILLIAM.L.MYNATT@CUSTOMS.TREAS.GOV

June 6, 2001

U.S. Customs Services -RPC
6026 Lakeside Boulevard
Indianapolis, Indiana 46278

REF: Contracts # TC-1-96-013

CS-1-99-24748-8
CS-1-99-24749-6
CS-1-99-25600-1
CS-1-99-24747-0

ATTN: William Mynatt
ACO PFSG
U.S. Customs

Please make referenced to enclosed Notice of Assignment date January 14, 2000. In this notice the government had agreed that all payments due or to become due on above contracts would be made to the Assignee, Mercedes National Bank. We have seen copies of several checks that have been made directly to All Star Iron Works. At a minimum, checks should be made jointly to our Bank.

Please call us and inform us why this agreement has not been complied with. Mr. Soto has been a customer of our bank for several years, but the fact that these jobs have had numerous change orders and have gone beyond the projected time of completion does concern us.

Please call me so that we can discuss this matter. We would like to know if your agency is paying some of the sub-contractors directly. This will definitely have an impact on how we structure any future advances.

Your prompt and courteous attention to this matter would be greatly appreciated. We do not want to interrupt the normal progress of work to complete these contracts.

Sincerely,

Aaron R. Gonzalez
Executive Vice President

APP 069

Subj: Re: URGENT/PLEASE RESPOND
Date: 06/11/2001 5:11:38 AM Central Daylight Time
From: WILLIAM.L.MYNATT@CUSTOMS.TREAS.GOV
Sender: WILLIAM.L.MYNATT@CUSTOMS.TREAS.GOV
Reply-to: WILLIAM.L.MYNATT@CUSTOMS.TREAS.GOV
To: MNBTX777@aol.com

Mr. Gonzalez,

U.S. Customs has a "privy of contract" with All Star Iron Works to provide construction projects. Customs does not have a contract or any obligation with any subcontractor that All Star utilized or any bank that provides the contractor with services.

Customs does not issue progress payments to subcontractors.

The undersigned agreed to mail progress payments for some of the task orders to your bank as a courtesy to All Star. The problem seems to be I changed the mailing address in my computers at Indianapolis, IN however the finance office that mails the checks in Pennsylvania did not change the address they have in their computer.

I will contact the finance office to assure that the mailing address is changed to match your bank address.

Mynatt



Gonzalez
DEPOSITION EXHIBIT
6
PENGAD 800-631-6989

MNB
Mercedes
National Bank

**Aaron (Ronnie) Gonzalez**
Executive Vice President

U.S. Customs Service, RPC
6026 Lakeside Boulevard
Indinapolis, Indiana 46278

June 11, 2001

REF: All Star Iron Works

ATTN: Lee Sullivan

As per our conversation a few minutes ago, I am sending you the following:

1. Notice of Assignment listing all contracts by number under one master number.
2. Letter of Approval from your Agency.
3. Security Agreement assiging contracts.
4. UCC Original Filing.
5. UCC Filing of amendment adding the four (4) US Customs contracts.
6. UCC Continuation Filing.

Please review the enclosed information and call so that we can correct any instrument that you agency feels needs modification. To this date we are not receiving checks payable to our bank.

Sincerely,

Aaron R. Gonzalez
Executive Vice President

DEPOSITION EXHIBIT
Gonzalez 7

APP 071

P.O. Box 777 Mercedes, Texas 78570 (956) 565-2485 Fax 956-565-5050

MNB
Mercedes
National Bank

**Aaron (Ronnie) Gonzalez**
Executive Vice President

U.S. Customs Service
Field Procurement Services
Contracts Section
Indianopolis, Indiana

June 12, 2001

REF: All Star Iron Works

ATTN: Bill Mynatt

Thank you for responding to our letter concerning the above client in a timely manner. Our files are presently being reviewed by OCC, Office of Comptroller of Currency, and All Star Iron Works is one of the files they have selected for review.

In our loan to All Star Iron Works, we tried to perfect our lien on specific government contracts that All Star had with the government. In this lien instrument, the four contracts that we previously mentioned are listed. It was both the bank's and All Star's intent that checks be made jointly to the bank and All Star. In the letter that we sent to your agency, you agreed to make the checks solely in the name of the bank. This can be modified to include both the bank and All Star.

OCC wants us to assure them that the collateral for this loan is intact and that the bank does have a good handle on the application of proceeds that are paid to All Star. We have a good relationship with All Star Iron Works and the owner does provide us with copies of checks issued by your department.

We would appreciate anything you can do to assist us in making sure that the checks are made jointly to our bank and All Star in the future. This will give us better control of the funds and get us in compliance with our original intent. It will also satisfy OCC with their findings.

I realize how a change of address can complicate issues. Please contact me if further complications should occur.

Sincerely,

Aaron R. Gonzalez
Executive Vice President

PENGAD 800-631-6989
Gonzalez
DEPOSITION EXHIBIT
8



P.O. Box 777, Mercedes, Texas 78570 (956) 565-...

**U.S. Customs Service**
6026 Lakeside Boulevard
Indianapolis, IN 46278

July 4, 2001

Mr. Aaron Gonzalez
Mercedes National Bank
POB 777
Mercedes, TX 78570

Dear Mr. Gonzalez

Reference: Attached letter dated June 12, 2001

Please be advised the reason progress payments for All Star Iron Works Inc have not been forwarded to your bank is the Electronic Funds Transfer (EFT) information has not been provided to the United States Customs Service Accounts Services Division (ASD).

Attached is a standard form 3881 with a pink cover sheet. Please coordinate with All Star Iron Works Inc and complete the Payee/Company Information and the Financial Institution Information blocks and sign the form and send to the ASD.

Additional questions should be directed to the undersigned at telephone 317-298-1180 ext. 1270 or FAX 317-298-1344 or E-mail at WILLIAM.L.MYNATT@customs.treas.gov or in writing at the following address:

U.S. CUSTOMS SERVICE
ATTN: William L. Mynatt
Field Procurement Service Branch
6026 Lakeside Boulevard
Indianapolis, IN 46278

Sincerely,

William L. Mynatt
Contracting Officer

CC:
File

TRADITION ★ SERVICE ★ HONOR

PENGAD 800-631-6989 Gonzalez DEPOSITION EXHIBIT 9

# ACH VENDOR/MISCELLANEOUS PAYMENT ENROLLMENT FORM

OMB No. 1510-0056
Expiration Date 01/31/2000

This form is used for Automated Clearing House (ACH) payments with an addendum record that contains payment-related information processed through the Vendor Express Program. Recipients of these payments should bring this information to the attention of their financial institution when presenting this form for completion.

## PRIVACY ACT STATEMENT

The following information is provided to comply with the Privacy Act of 1974 (P.L. 93-579). All information collected on this form is required under the provisions of 31 U.S.C. 3322 and 31 CFR 210. This information will be used by the Treasury Department to transmit payment data, by electronic means to vendor's financial institution. Failure to provide the requested information may delay or prevent the receipt of payments through the Automated Clearing House Payment System.

## AGENCY INFORMATION

FEDERAL PROGRAM AGENCY: U. S. Customs Service

AGENCY IDENTIFIER: 2006

AGENCY LOCATION CODE (ALC): 20-06-0800

ACH FORMAT: [X] CCD+ [ ] CTX [ ] CTP

ADDRESS: Accounting Services Division, 6026 Lakeside Blvd., P.O. Box 68908
Indianapolis, IN 46268

SCS-ACCTS PAYABLE GRP. 2001 JUL 20 A 11:28

CONTACT PERSON NAME: Accounts Payable – Commercial Accounts

TELEPHONE NUMBER: (317) 298-1200, Ext. 5001

ADDITIONAL INFORMATION: Vendor ID: ALSTIRWO

## PAYEE/COMPANY INFORMATION

NAME: ALL STAR IRON WORKS, INC

SSN NO. OR TAXPAYER ID NO.: 74-2303378

ADDRESS: P O BOX 83
MERCEDES, TEXAS 78570

CONTACT PERSON NAME: ALEX SOTO

TELEPHONE NUMBER: (956) 565-4987

## FINANCIAL INSTITUTION INFORMATION

NAME: MERCEDES NATIONAL BANK

ADDRESS: P O BOX 777 (201 S. TEXAS)
MERCEDES, TX 78570

PENGAD 800-631-6989 DEPOSITION EXHIBIT Gonzalez 10

ACH COORDINATOR NAME: BONNIE DE LA FUENTE

TELEPHONE NUMBER: (956) 565-2485

NINE-DIGIT ROUTING TRANSIT NUMBER: 1 1 4 9 2 0 1 2 8

DEPOSITOR ACCOUNT TITLE: ALL STAR IRON WORKS, INC.

DEPOSITOR ACCOUNT NUMBER: 010-334-1

LOCKBOX NUMBER:

TYPE OF ACCOUNT: [X] CHECKING [ ] SAVINGS [ ] LOCKBOX

SIGNATURE AND TITLE OF AUTHORIZED OFFICIAL: (Could be the same as ACH Coordinator)
[signature] Presid.

TELEPHONE NUMBER: ( ) 565-2485

APP 074

NSN 7540-01-274-9925

AGENCY C

3881 (Rev 12/90)
Prescribed by Department of Treasury
U S C 3322; 31 CFR 210

# *ACE COURT REPORTING SERVICE*

***& Digital Videography***

***Statewide & Nationwide Scheduling***

***ORAL DEPOSITION OF***
***Cheryl Bellany***
***Taken on March 26, 2008***

***Cause No. 07-00355C; Texas National Bank f/k/a Mercedes National Bank v. United States***

COPY


***Ace Court Reporting Service***
***& Digital Videography***
***Leideker Building***
***200 E. Cano***
***Edinburg, Texas 78539***
***Firm Registration No. 476***
***Expiration Date: 12/31/09***
***(956)380-1100***
***Fax: (866) 380-1135***
***www.acecourtreporting.com***
***info@acecourtreporting.com***

orders. So he -- he would do the work, the bank would provide the money to do the work, and we would assume that the monies were still out there, but it might be two years down the road before he got paid. And that was the case in several instances. And the bank never really knew what was out there that was still to be paid. We tried. We made an attempt several times to determine what was still there. You remember that this was a revolving line of credit and we loaned money based on 80 percent of contracts that were still outstanding. And if we did not get something to show us that payments had been received, we assumed that the money was still to come in.

Q. Did you ever request Mr. Soto that he tell you when he got a check from the government on any of these assignments at any point after --

A. Not -- not -- after we started having these problems. Then it became obvious that we had problems. But up until this time, we had done what any prudent banker would do to take steps to ensure that we were getting the funds or were aware of the funds and that we could control the funds. And that was by making an assignment and asking the government to make those checks at least jointly payable. If the checks had been made jointly payable, he could not have deposited them into the account without getting our approval. And that was the

reason we wanted that. We had no control over what he did with those funds. We don't even know if all the funds came into this bank.

Q. But you knew at least some of the funds came into this bank?

A. Well, we knew that -- we knew that -- we weren't there. We did not typically make it a policy to go in and monitor his everyday account for deposits that came in there. That would be impossible for us to do. I mean, every -- checks that come in here are processed some place else. I mean, I guess if he came in and physically deposited them and somebody knew him. But we had no reason -- we had no reason to do that, because we had gotten the approval from the government that they were going to make the checks jointly payable. Once we realized that that was not happening, well, then we took better control. But this was after things had already happened.

Q. And that -- that situation existed -- the assignment is dated January of 2000, Mr. Gonzalez's letter referring to checks that he received. At some point between January 14th, 2000 and June 6th, 2001, that's a year-and-a-half. There was -- the bank was powerless in a year-and-a-half to take any action?

A. We weren't powerless. We just -- we didn't see

any reason to do anything. We were -- we were supplying funds and we were very prudent with where the funds went. The funds went into the jobs. And we -- we could show that. I mean, you know, we can go -- because we did have -- we did not allow checks to be written on that account unless we knew where the funds were going. So we knew that we had an assignment on these contracts. We knew those contracts were still out there. So we knew that, eventually, we were going to get paid, particularly since we felt like we had control of the funds, but because of the fact of the assignment.

Q. But with as much care as you described you disbursed the funds, only for specific purposes, only upon verification of those specific purposes, you made no effort to ensure that the money would be paid back to the bank in accordance with the assignment?

A. Remember, it is a revolving line of credit. There's no way that $240,000 is going to -- to even pay for $400,000 unless that money is revolving. It ended up that these jobs were not $400,000, it was a million dollars plus, which we were not aware of, and there were a lot of change orders that happened in there which everybody lost control of. And I made several attempts to try to even get a handle on where we were. So it's a revolving line of credit. The way a revolving line of

credit works is, I advance the funds based on the fact that I had $400,000 that I knew was coming back. I advanced $240,000, plus another $125,000, or at least $85,000, I know, which was the $85,000 for the CD that was put up on the bond, which, by the way, was eventually depleted also somehow. I advanced those funds. That money that I advanced went into the bridges. Mercedes National Bank paid for the bridges. And we still to-date have those loans outstanding on our books, despite the fact that monies came in. The monies came in because we started something. We -- we had an obligation to finish it. Mr. Soto had an obligation to finish it. The only way that was going to get finished was if Mercedes National Bank would continue to provide the funds. So if funds came into his account, then what we would do would be to look to see -- he still has to complete those jobs. So we would still see if we would pay checks to complete those jobs, which we did. So we put -- I don't know how much money we put into those jobs. We put $750,000 into those jobs. And we still have on our books the original monies, because it was a revolving line of credit. And we were not able to control -- the reason we weren't able to control it was because U.S. Customs could not provide this bank with numbers as to the amounts that were left to be paid on those jobs. And I asked several times. I dealt

with Mr. Lee Sullivan trying to get that. Because that's how we make our determination whether or not we're going to advance more funds, whether or not there is at least 80 percent of the value of contracts left, you know, on our revolving line.

Q. Right. But -- I mean, I understand that. I understand the bank's frustration here. I understand that the bank's out a lot of money thanks to All Star. But, I mean, here's a check dated December 15th, almost a year after the assignment was made, for $70,000. It doesn't -- wouldn't it have been possible for someone -- for the bank to have put a hold on government checks being deposited into All Star's bank account, if only for the purpose of ascertaining what that $70,000 was for, whether that was part of the assignment? That's a lot of money.

A. We didn't do that. We -- we asked the government to make checks jointly payable. And if we had received it then, then maybe we would have taken a look to see what was happening. But we never -- we never -- we never got notice during that year-and-a-half period of time. And it was not uncommon for us -- I mean, this -- a bank has more customers than this one customer. And you just can't -- you can't -- you can do so much. And we felt like that by putting the government on notice and them agreeing to make the checks jointly payable and

monitoring where the checks were going to make sure that those monies were going into the bridges that we had the contracts on, that we should be okay, until a year-and-a-half later when we found out that -- and I think the problem was that nobody, at that point, then, knew where we stood on what was left to be paid on these jobs. And to this date, I have not received an answer, although I have asked in writing and I have asked numerous times. And I have never, to this date, received anything to tell me what was still left to be paid on those jobs, although I left in 2005 and I think people gave up after that.

Q. Did the bank have other lines of credit, revolving lines of credit, for $240,000?

A. I'm sure they did.

Q. I mean, was All Star -- was All Star one of the bank's larger clients?

A. I don't know if you'd say larger. We had clients that owed us $800,000 loans. So they weren't our largest client.

Q. Among the largest ten clients?

A. No. I wouldn't say so, no. We were -- well, we had a list of the largest clients and they were on the list of -- what we did that was $75,000 and over. But they weren't our largest client.

assignment of January 14th, 2000?

A. Not in connection with the assignment. We had -- the bank had received -- not the bank. But as I recall, Mr. Soto had received a letter and it appeared -- it seems like it was -- I don't remember -- 2000, maybe, when things were going to change. And it was not necessarily for U.S. Customs, but it was for all government payments, that they wanted government payments to be done electronically. The bank did not receive any kind of -- as I recall, the bank did not -- did not receive anything at this date when we asked for this that indicated that we needed to do something electronically.

Q. And you're referring to the notice of assignment?

A. The notice of assignment. Exhibit 4 -- well, is that 4?

MR. SNYDER: That's my handwriting That's a 4, yeah.

Q. (By Ms. Stentiford) Let me show you Exhibit 10 and I'll ask you a couple of questions about it. Can you tell me what Exhibit 10 is.

A. That's an ACH enrollment form.

Q. And is that your signature at the bottom?

A. Yes.

Q. Why did you sign this?

A. To allow funds to be transmitted electronically.
Q. Okay. And this is dated -- if you can see, there's a date stamp in the center of the document.
A. Is that our date?
Q. I believe, if you look carefully, and feel free to disagree with me, but I believe it says U.S.C.S, which suggests to me U.S. Customs Service accounts payable group, in scratchy letters --
A. I see that.
Q. -- July 20th, 2001. And Mr. Gonzalez testified yesterday that the information for the financial institution would have been provided by this Bonnie De La Fuente, whose name appears on that. Do you think that is correct?
A. Where is her name? Oh, there. Yeah. There it is. ACH coordinator, Bonnie. Yeah.
Q. So is it your understanding that Ms. De La Fuente would have filled out the financial institution information on this form?
A. Yes.
Q. Was she one of your employees?
A. Yes.
Q. And you said this was a form to allow payments to be made. And this suggests that the -- well, this form

allows payments to be made into Mercedes National Bank's account with Mercedes -- I'm sorry. This form provides information to allow electronic payments to be transferred to All Star Iron Work's account with Mercedes National Bank; is that correct?

A. Yes.

Q. And is it -- I'll just -- looking at this, based on the date stamp that's on -- July 20th, 2001, I would think that this Exhibit 10 was provided to the government in response to Exhibit No. 9, the letter from Mr. Mynatt, requesting form 3881 of which Exhibit 10 is an example. Is that -- do you disagree with me?

A. I mean, I don't know for a fact that that's what happened. I mean, I see the dates are close.

Q. So my question, then, is if the bank's goal is to have money -- have the government send payments under the assignment to it rather than to All Star, why on Exhibit 10 is All Star Iron Works given as the payee?

A. Because that's the way it would have to be. Mercedes National Bank has -- has no right to the monies of All Star Iron Works. They have a right to be notified about those payments. But this is the way that any funds -- this is the type of -- this is a form that would have been used for any funds to have been sent into the bank electronically. And it's just -- you would normally put

the customer's account that it's going to go into.
Q. But here, this is --
A. And we would not have put it -- I mean, we wouldn't have put it going into Mercedes National Bank's account.
Q. Well, how then would the government be expected to make payments -- electronic payments under the assignment? How would you expect that to be done?
A. I don't know that -- really, I don't know on that one.
Q. Because it appears that Exhibit 10 was provided in response to the government's request, "Please tell us," you know, "we haven't been paying -- we -- the government hasn't been sending Mercedes Bank the assignment payments because we don't have electronic funds transfer information," and then you provide electronic funds transfer information to pay All Star Iron Works directly.
MR. SNYDER: I'll also object that that's not really what Exhibit 9 says. It doesn't really say that the reason we haven't been paying Mercedes National Bank directly. It just says the reason we haven't been forwarding payments to All Star to the bank.
A. It does say that. "The progress payments for All Star Iron Works have not been forwarded to your bank." That -- that implies to me that there was a question as to