**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **TEXAS NATIONAL BANK f/k/a MERCEDES NATIONAL BANK** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **NO. 07-00355C** |
| | § | **Judge Firestone** |
| **UNITED STATES** | § | |
| | § | |
| **Defendant.** | § | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES Plaintiff **TEXAS NATIONAL BANK f/k/a/ MERCEDES NATIONAL BANK** ("the Bank") and files this Response to Defendant **UNITED STATES'** ("Defendant") Motion for Summary Judgment (the "Motion"), and would show the Court the following:

## I. INTRODUCTION AND SUMMARY OF RESPONSE

This is a contract assignments case, brought by the Bank pursuant to the Assignment of Claims Act and Assignment of Contracts Act (31 U.S.C. §3727; 41 U.S.C. §15) to recover on payments that Defendant made directly to a government contractor, All Star Iron Works ("All Star") instead of to the Bank. Through its Motion, Defendant seeks summary judgment based on its arguments that (1) the assignment is invalid because the Bank failed to fully comply with the applicable statutory notice provisions; (2) Defendant, by its actions, did not waive compliance with

the applicable statutory notice provisions; and (3) some (but not all) of the Bank's claims for payments are barred by the six (6) year statute of limitations.

Defendant's Motion must be denied in its entirety because Defendant has not presented any evidence to this Court that the Bank failed to comply with the statutory notice requirements for perfection of its assignment. In fact, aside from not proving this point with evidence, in its Original Answer ***Defendant actually admitted that the Bank complied with the notice requirements***. As a result, at the very least a fact issue exists as to whether the Bank complied with the notice requirements.

Furthermore, fact issues exist as to whether Defendant, by affirmatively acknowledging and signing off on the Bank's Notice of Assignment after having it approved by the Customs Service's Legal Department, accepted the assignment and waived any complaint as to the adequacy of notice or compliance with the applicable statutory notice provisions. Indeed, the evidence is abundantly clear and undisputed that Defendant knew about the assignment; authorized and approved the assignment; but thereafter simply forgot about it or intentionally ignored it.

Defendant's limitations argument fails as well because Plaintiff has plead that it had no way of knowing about Defendant's payments in violation of the Assignment, and fact issues exist concerning when the Bank knew or should have known that Defendant was making payments directly to the contractor All Star instead of to the Bank on the specific contract at issue. Furthermore, there is some evidence that Defendant concealed its violation of the Assignment by refusing to provide the Bank with an accounting of payments made on the Contract, and therefore fact issues exist concerning whether and why Defendant refused to respond to inquiries from the Bank requesting an accounting to the Bank despite repeated requests regarding payment status.

Finally, even were the Court to determine that limitations has run on payments made prior to June 6, 2001, Defendant itself has admitted that it made some **$168,035.19** in payments directly to the contractor in violation of the assignment *after* June 6, 2001. Those payments would not be barred by limitations and are therefore not subject to summary judgment.

As such Defendant has wholly failed to satisfy its burden under the summary judgment standard. Because Defendant has not met its burden in the summary judgment context, this Motion should be denied.

## II. SUMMARY JUDGMENT EVIDENCE

This Response is supported, in part, by the summary judgment evidence attached to Defendant's Proposed Findings of Uncontroverted Facts (subject to the objections set forth in Plaintiff's Response thereto, as well as in the separately filed Objections), as well as by the summary judgment evidence attached to Plaintiff's Proposed Findings of Uncontroverted Facts. Said evidence consists of portions of the transcripts of the depositions of Mrs. Cheryll Bellamy, the former President of Plaintiff's predecessor the Mercedes National Bank ("Bellamy") and Aaron Gonzalez, a representative of Plaintiff ("Gonzalez"), as well as a Declaration from Mrs. Bellamy.

## III. SUMMARY OF FACTUAL BACKGROUND

In January 2000, the Bank extended a loan to government contractor All Star Iron Works ("All Star") via a revolving line of credit to provide capital to All Star to finance its work on design/build contracts for the U.S. Customs Service to construct inspection stations on four (4) international bridges along the U.S.-Mexico border. Plaintiff's Proposed Findings of Uncontroverted Facts ("PPFUF") at ¶1.

As collateral for this extension of credit, the Bank sought to perfect a lien on certain of All Star's accounts receivables, specifically the contract task orders from the Customs Service. PPFUF at ¶2. The task orders were all under prime contract TC-I-96-013 between All Star and U.S. Customs. *Id.*

In order to secure its lien, on or about January 14, 2000 the Bank signed an Assignment agreement with All Star, whereby All Star assigned to the Bank all payments due to All Star from the Government on contract TC-I-96-013, and on that same date the Bank sent a Notice of Assignment (also signed by All Star) to U.S. Customs. PPFUF at ¶3. (The actual Assignment is attached to Defendant's PFUF at App. 011-012; the Notice of Assignment is attached to Defendant's PFUF at App. 013). The Bank sent two (2) copies of the Notice of Assignment to U.S. Customs at 6026 Lakeside Boulevard, Indianapolis, Indiana. *Id.*

The pertinent contract, TC-I-96-013, does not specifically list a contracting officer of disbursing officer by name. See Contract, attached to Defendant PFUF at App. 001. The Contract states that the Contract will be administered by U.S. Customs at 6026 Lakeside Boulevard, Indianapolis, Indiana, and that payments will be made by U.S. Customs at 6026 Lakeside Boulevard, Indianapolis, Indiana. *Id.*

At the time of the assignment with All Star, the Bank had experience with assignments of government contracts, having made assignments with the U.S. Government several times in the past. PPFUF at ¶5. The Bank possessed the Government regulations on assignments and followed those regulations as far as providing the instant Notice of Assignment to the proper Government representatives. *Id.*.

Cheryl Bellamy, the President of the Bank in January 2000, has testified that she is confident that the Bank mailed the Notice of Assignment, along with a copy of the actual assignment, to the

disbursing officer, by mailing it to the same address that was listed in the Contract, 6026 Lakeside Boulevard, Indianapolis, Indiana. PPFUF at ¶6.

After sending the Notice of Assignment to the contracting officer at Customs, William Mynatt ("Mynatt"), the Bank received a response from Mynatt informing the Bank that he had forwarded the Notice of Assignment to Custom's legal counsel, and that once it was approved by said legal counsel, the Notice of Assignment would be signed by Customs and returned to the Bank. PPFUF at ¶7. See January 24, 2000 letter from William Mynatt, attached as App. 015 to Defendant's PFUF. Thereafter the Notice was signed by Mynatt, which led Bellamy, as the President of the Bank, to believe that the Notice of Assignment had been properly approved by the Customs Service. *Id.*. See Notice of Assignment, executed by Mynatt, attached as App. 013 to Defendant's PFUF.

After receiving the approval of the Assignment from U.S. Customs, the Bank began to advance money to All Star on its line of credit for the work to be performed on the international bridges. PPFUF at ¶8. The majority of the funds were most likely advanced during the first six months after the Assignment was made. *Id.*

The Bank did not discover that Defendant had been making payments directly to All Star until roughly June 2001. Around June 2001, the Bank's examiners from the Office of the Comptroller of the Currency ("OCC") discovered during their audit of the Bank that the Government had been making payments directly to All Star. *Id.*, at 26:13-27:5. At that point, in June 2001, Bank Vice President Aaron Gonzalez ("Gonzalez") was assigned by the Bank to investigate the All Star file. Gonzalez Depo., at 12:9-14, App. 49.

As a result of the discovery of wrongful payments, Mr. Gonzalez sent a letter to Mynatt notifying Mynatt of the Bank's discovery and requesting that Mynatt rectify the problem and pay the

Bank per the Assignment. See Gonzalez's June 6, 2001 letter to Mynatt, attached as App. 062 to DPFUF. Mynatt responded via e-mail dated June 11, 2001, informing the Bank that the reason the Bank was not receiving the payments was because, although Mynatt had changed the payment destination in his computer, the finance office in Pennsylvania that mails the checks had not changed the payment destination in its computer. See Mynatt's June 11, 2001 e-mail, attached as App. 070 to DPFUF. Mynatt went on to inform the Bank that he was going to advise the Pennsylvania office to change the payment destination. *Id.*

Mynatt subsequently sent another letter to the Bank on July 4, 2001, in which he informed the Bank that "*the reason progress payments for All Star Iron Works have not been forwarded to you bank*" is because the electronic funds transfer information had not been provided. See Mynatt's July 4, 2001 letter, attached as App. 073 to DPFUF.

After the Bank found out, in June 2001, that the Government had been making payments directly to All Star, Bellamy got directly involved in discussions with the Government to resolve the problem. PPFUF at ¶19. Bellamy had conversations with Mynatt's superior at Customs, Lee Sullivan, who informed Bellamy that he believed the Assignment had been done properly. *Id.*. Sullivan promised Bellamy that he would provide an accounting showing amounts still due to be paid under the Contract TC-I-96-013, but he never fulfilled that promise and never provided the Bank with the accounting. *Id.*

Bellamy got Sullivan involved because Mynatt would never provide the Bank with copies of all of the change orders the Government had submitted to All Star on Contract TC-I-96-013. PPFUF at ¶20. Once he got involved, Sullivan indicated to Bellamy that the reason he was taking over was because Mynatt "had dropped the ball", and that he had several jobs that he had not been able to monitor properly and that that was the reason that Contract TC-I-96-013 was in such a mess. *Id.*

Despite all of the Bank's written requests for an accounting from the Government, no such accounting was ever provided to the Bank. *Id.*

By the time the Bank became of aware of the Government's direct payments to All Star in June 2001, the damage had already been done. PPFUF at ¶21. That is because the Bank had already loaned the money to All Star, and all of the payments had already been made by the Government to All Star. *Id.*

By December 2002, the Bank still had not received a response from the Government providing an accounting showing how much money remained to be paid to All Star under Contract TC-I-96-013, and so the Bank went to the extreme of hiring a related Company to make a Freedom of Information Act ("FOIA") request for documents from the Government. PPFUF at ¶22. The Bank did the FIOA request in order to obtain the information on an accounting that it had been requesting from the Government since June 2001. *Id.*

After receiving the response by the Government to the FOIA request, Bellamy followed up once again with Customs to get more information on payments still owing on Contract TC-I-96-013. Bellamy dealt with a woman from Customs in Indianapolis who was put in charge of accounting on Contract TC-I-96-013, and even then Customs *still* could not, or would not, provide the Bank with an accounting of what amounts remained due and owing under the Contract. PPFUF at ¶23.

In the end, the Bank never received a single payment from the Government pursuant to the Assignment on Contract TC-I-96-013. PPFUF at ¶24. Defendant has admitted to making well over $600,000 in payments directly to All Star under the Contract. See DPFUF at ¶22, 25 and 26.

## IV. ARGUMENTS AND AUTHORITIES

### A. SUMMARY JUDGMENT STANDARD

The moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c). Defendant, as the moving party, has the burden of establishing the absence of disputed genuine issues of material fact and its entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact is one that would change the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In the capacity of opposing defendant's motion, plaintiff has the burden of providing sufficient evidence to show that a genuine issue of material fact indeed exists. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. Any evidence presented by the nonmovant is to be believed and all justifiable inferences are to be drawn in its favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Summary judgment pursuant to RCFC 56 properly can intercede and prevent trial if the movant can demonstrate that trial would be useless in that more evidence than is already available in connection with its motion could not reasonably be expected to change the result. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626 (Fed.Cir.1984).

### B. WHETHER THE BANK COMPLIED WITH THE NOTICE REQUIREMENT

Defendant seeks summary judgment on the grounds that the Notice of Assignment was invalidated by the Bank's failure to comply with the statutory notice procedures. Specifically, Defendant asserts that the Bank failed to comply with the notice provisions in two (2) respects: (i) in failing to send a copy of the Notice of Assignment to the disbursing officer named in the

Contract, and (ii) in failing to attach a copy of the actual Assignment between the Bank and All Star to the Notice of Assignment that the Bank sent to Defendant.

As a preliminary matter, Defendant has already admitted in its Original Answer that the Bank provided a copy of the Notice of Assignment to the disbursing officer. In its Original Complaint, the Bank alleged in the first sentence of ¶4 that it "*promptly provided notice of the Assignment to Defendant via U.S. Customs' contracting and disbursing officer*". See Original Complaint, docket #1 at ¶4. In its Original Answer, Defendant admitted "*the allegations contained in the first sentence of paragraph 4 of the complain*t." See Defendant's Answer, docket # 6, at ¶4. The law is clear that by admitting an allegation made in a complaint, said allegation must be taken as true without the need for evidence or finding. See e.g., *National Candy Co. v. FTC*, 104 F. 2d 999 (7th Cir. 1939); see also RCFC 8(d)(averments in a pleading are deemed admitted if not denied in the responsive pleading). Thus there is no basis for summary judgment on this point because Defendant has admitted that the Bank complied with the notice procedures by providing a copy of the Notice of Assignment to the disbursing officer.

Even if Defendant had denied this allegation, Defendant has completely failed to meet its burden to present summary judgment evidence to prove that the Bank did not provide a copy of the Notice of Assignment, or of the Assignment itself, to the disbursing officer. Again, the Bank has plead that it did provide the notice; therefore to prevail on summary judgment Defendant must present some evidence to controvert that allegation.

The only summary judgment proffered by Defendant on this point is contained in ¶7 of its DPFUF, which in turn cites solely to ¶4 of the Declaration of Ronald H. Newman. In said Declaration, Mr. Newman avers that he has "reviewed the documents in [his] custody and control" and could not locate any document evidencing that All Star assigned its claim to the

Bank. See Defendant's App. 129. While Plaintiff has objected to several aspects of Mr. Newman's declaration, the most important thing about Newman's declaration is what it *doesn't* say. **Mr. Newman does not say that he was the disbursing officer entitled to receive the Notice of the Assignment under the applicable statutory notice provisions, and that he didn't receive it; nor does he state that he even knows who that disbursing officer is or was, or whether the disbursing officer received the Notice.** Therefore, how in the world would Newman, who just started working in his current position on July 23, 200**7**, know whether or not the disbursing officer for the Contract received the Notice of Assignment back in 2000?

Indeed Newman does not even testify that the Bank did not send the Notice of Assignment, or the Assignment itself, to the disbursing officer; all he says is that he couldn't find any documentation within the documents that he has within his custody and control. He doesn't testify that he is the custodian of records for the Customs Service; nor that he has in his custody and control all of the Contract disbursing officer's records from 2000; nor does he testify as to what steps he took to search Customs' records for the Assignment. That he, by himself, reviewed an undefined group of perhaps limited documents that he, by himself, has custody and control over, does not in any way mean that the document does not exist within Customs' files, or is within the custody or control of another employee at Customs (such as the custodian of records or the actual Contract disbursing officer).

In short, Defendant has presented no evidence to prove, or even to put into question, whether or not the Bank sent the Notice of Assignment, or the Assignment itself, to the disbursing officer.

In contrast the Bank has provided sufficient evidence to raise a fact issue on whether or not the Notice of Assignment, and the Assignment itself, were sent to the disbursing officer.

Cheryl Bellamy, the President of the Bank in January 2000, has testified that she is confident that the Bank mailed the Notice of Assignment, along with a copy of the actual assignment, to the disbursing officer, by mailing it to the same address that was listed in the Contract, 6026 Lakeside Boulevard, Indianapolis, Indiana. Bellamy Dec., at ¶4, App. 62-63. She also points out that the Notice of Assignment itself references that a copy of the actual Assignment is attached thereto, and testifies that if she wrote that the Assignment was attached, then the Assignment was attached. *Id.* see also Notice of Assignment, attached to DPFUF at App. 013. Mrs. Bellamy testified in deposition that the Bank sent at least two (2) copies of the Notice of Assignment to U.S. Customs at 6026 Lakeside Boulevard, Indianapolis, Indiana, and that she believes that the Bank sent the Notice to the disbursing office at the same address even though no specific disbursing officer was listed in the Contract.[1] PPFUF ¶3.

She further testified that the Bank had experience with assignments of government contracts, having made assignments with the U.S. Government several times in the past. PPFUF ¶5, and that the Bank possessed the Government regulations on assignments and followed those regulations as far as providing the instant Notice of Assignment to the proper Government representatives. *Id.*

Finally, Mrs. Bellamy testifies that Mynatt informed her via his response letter dated January 24, 2000 that he was going to have the Customs Service's Office of Legal Counsel review and approve the Notice of Assignment and that Mynatt would only sign it once he had obtained said legal approval, and that after she received the Notice of Assignment back from Customs signed by Mynatt, she relied upon his signature as an indication that Customs' lawyers had reviewed and approved the Notice of Assignment, which meant (to Bellamy) that she had done everything properly and correctly

[1] The pertinent contract, TC-I-96-013, does not specifically list a contracting officer or disbursing officer by name. See Contract, attached to Defendant PFUF at App. 001. The Contract states that the Contract will be administered by U.S. Customs at 6026 Lakeside Boulevard, Indianapolis, Indiana, and that payments will be made by U.S. Customs at 6026 Lakeside Boulevard, Indianapolis, Indiana. *Id.*

in terms of providing the proper notification to the contracting and disbursing officer and attaching a copy of the actual Assignment to the Notice. Bellamy Dec., at ¶ PPFUF ¶7; see also Mynatt's letter, attached to DPFUF at App. 015.

Finally, and consistent with her deposition testimony, Bellamy points out that in June 2001, when the Bank found out that Defendant had been making payments directly to All Star in violation of the Assignment, she talked to Mynatt's supervisor, Lee Sullivan, who at first told Bellamy over the telephone that the Bank had not completed the Notice of Assignment properly. Bellamy Dec. at ¶6 (App. 63-64) But then the Bank, via Aaron Gonzalez's letter dated June 11, 2001, sent Mr. Sullivan copies of everything that the Bank had sent to Customs back in January 2000 and after Sullivan received and reviewed that documentation, Sullivan called Bellamy and told her that the Bank had, in fact, completed the Notice of Assignment properly, and admitted that the Notice of Assignment was valid. *Id*.; see also Gonzalez's letter, attached to DPFUF as App. 071.

Defendant cites this Court to Judge Gibson's decision in *American Financial Associates* as being determinative of this issue. *American Financial Associates*, 5 Cl. Ct. 761 (1984). But in that case, the Government presented solid evidence that the plaintiff had not provided notice to the disbursing officer, including an affidavit from one of the disbursing officers testifying that she had spoken to a representative of the plaintiff and that the plaintiff had admitted that it had not sent the proper notification to the disbursing officer. *Id*., at 768. In contrast there is no such affidavit or admission in the present case.

*American Financial Associates* is also illuminating with regard to another issue: whether notice to the disbursing officer was even required given that no specific officer is identified in the Contract.[2] In the present case, the Contract does not list a specific disbursing officer; rather it simply

[2] The Act is specific that notice of an assignment is required to be provided to the disbursing officer, ***if any***, designated in such contract. 41 U.S.C. §15.

lists a subsection of the Customs Service's office at 6026 Lakeside Boulevard, Indianapolis, Indiana. See Contract, App. 001 to DPFUF. This same issue was raised in *American Financial Associates*, but in that case the contract at issue listed a code, Code 55.23, and the Government presented uncontroverted evidence that that code identified a specific disbursing officer. *Id.*, at 768. Based on this uncontroverted evidence Judge Gibson went on to hold that the "inclusion of said code number and address was an adequate designation of the disbursing officer". *Id.* See also, *Merchant's Funding Group*, 33 Fed. Cl. 445, 452-453 (inclusion of code number in contract sufficient to identify disbursing officer for notice purposes).

In contrast, in the instant case there is no evidence from Defendant of any Code number or any other similar designation within the Contract that would alert the Bank as to the identity of the specific disbursing officer. As such this case is entirely distinguishable from *American Financial Associates*, and to the undersigned counsel's knowledge there is no case law authority that would disallow a claim by a financing institution for failure to notify a disbursing officer in a situation where no specific officer is identified in the contract either by name ***or*** by code number.

The bottom line is that fact issues exist with regard to whether the Bank complied with the notice provisions. The Bank contends and has presented evidence to demonstrate that it did comply, and Defendant has produced no evidence that the Bank did not comply. The most glaring hole in Defendant's position is the fact that it has been **unable to even provide the Court with the identity of the disbursing officer under Contract TC-I-96-013**. As a result, the Court does not know who the disbursing officer was and whether he or she received the Notice. Indeed there is some evidence that the contracting officer and the disbursing officer might have been one and the same, since Mynatt has testified in his Declaration that he has worked in the "Office of Finance" within the Custom Service at 6026 Lakeside Boulevard, Indianapolis, Indiana since 1990, which would appear

to correspond to the disbursing office listed in the Contract. *Compare* Mynatt Declaration, attached to DPFUF, App. 130, at ¶1 *with* the Contract, App. 001.

**C. WHETHER DEFENDANT WAIVED THE NOTICE REQUIRMENTS**

Even if the Court were to determine that Defendant had submitted evidence sufficient to support a finding that the Bank did not fully comply with the statutory notice provisions, the law is "well established ... that the government can waive the statutory prohibitions against the assignment of contract rights **if the contracting officer gives clear assent to the assignment**." See e.g., *Norwest Bank Arizona, N.A. v. U.S.***,** 37 Fed.Cl. 605 (1997); *D & H Distributing Co. v. U.S.*, 102 F.3d at 542, 546 (Fed. Cir. 1996)(citing *Tuftco Corp. v. United States*, 222 Ct.Cl. 277, 614 F.2d 740, 745-46 (1980), and *G.L. Christian & Assocs. v. United States*, 160 Ct.Cl. 1, 312 F.2d 418, 423 (1963)). The waiver exception to the notice provisions of 41 U.S.C. § 15 was created to lessen the harsh results of a strict construction of the statute when the government's clear course of conduct indicated a recognition of the assignment. *Tuftco*, 614 F.2d at 744-45.

In the leading case on waiver, *Tuftco*, the court found that, because "the contracting officer was fully aware of the assignments, recognized them, and communicated such recognition to plaintiff", the action of the Government constituted a waiver of the Act's notice provisions. *Tuftco*, 614 F. 2d 740, 743-744 (Ct. Cl. 1980). The court noted, in particular, that it was "difficult to see how [the contracting officer's] signed acknowledgement was anything other than assent" to the assignment. *Id*., at 746. The court went on to hold that it "is unnecessary to identify any one particular act as constituting recognition of the assignments by the Government", and that a court had to examine the "totality of the circumstances" in making a determination on waiver. *Id*.

The courts have followed the *Tuftco* reasoning without exception. In *D&H Distributing*, the Federal Circuit affirmed the logic of *Tuftco*, holding that a contracting officer, acting by himself, can waive the statutory notice provisions if he gives assent to the assignment by taking action such as, *inter alia*, adopting the assignment by changing the payment destination in the contract. *D&H Distributing*, 102 F. 3d 542, 546 (Fed. Cir. 1996).

In *Norwest Bank* and later in *Summerfield Housing*, the courts followed *D&H Distributing* and held that a contracting officer unilaterally waived the notice requirements by modifying the contract to change the payment destination. See *Norwest Bank Arizona, N.A. v. U.S.*, 37 Fed.Cl. 605 (1997); *Summerfield Housing LP v. U.S.*, 42 Fed. Cl. 160 (1998). More recently, in *Riviera Finance*, Chief Judge Damich noted that waiver by the Government can be found based on the totality of the circumstances, including whether: (1) the assignor and/or assignee sent notice of the assignment to the Government; (2) the contracting officer signed the notice of assignment; (3) the contracting officer modified the contract according to the assignment; and (4) the Government sent payments to the assignee pursuant to the assignment. *Riviera Finance of Texas, Inc. v. U.S.*, 58 Fed. Cl. 528, 530 (2003). The Court cited *Banco Bilbao* for the proposition that waiver can be found "where the government has <u>either</u> ***affirmatively acknowledged an assignment in writing*** <u>or</u> made payments consistent with the alleged assignment." *Id.* (citing *Banco Bilbao Vizcaya-Puerto Rico v. U.S.*, 48 Fed. Cl. 29, 34 (2000)). In *Riviera Finance*, Judge Damich went on to find that the Government's signing of the assignment confirmation letter, and the contracting officer's modification of the payment destination in the contract, were factors that weighed against the Government and in favor of a finding of waiver. *Id.*, at 531-533.

In contrast to the facts presented in the instant case, in *Trust Company Bank*, the Court rejected a waiver argument where the evidence demonstrated that the plaintiff on multiple occasions sent the notice of assignment to the contracting officer, who refused to accept it after the Navy's legal counsel reviewed it but refused to approve it. *Trust Company Bank of Middle Georgia v. U.S.*, 24 Cl. Ct. 710, 711 (1992). The Court distinguished *Tuftco* by pointing out that the contracting officer in Trust Company Bank never signed any acknowledgement recognizing the assignment. *Id.*, at 712.

In the present case, the totality of the circumstances cry out for a finding of waiver. First of all, the evidence is undisputed that the contracting officer for the Contract, William Mynatt, received the Notice of Assignment from the Bank. The evidence is also undisputed that Mynatt sent a letter back to the Bank in which he informed the Bank that, prior to signing off on the Notice of Assignment, he forwarded the Notice of Assignment to the Customs Service's Office of Chief Counsel for review and approval. The evidence is also undisputed that sometime thereafter, Mynatt signed the "Authorized/Acknowledged" portion of the Notice of Assignment and sent it back to the Bank.[3] PPFUF ¶7.

The evidence is also undisputed that, when the Bank complained in June 2001 about not receiving payments per the assignment, Mynatt responded by e-mail dated June 11, 2001 and informed the Bank that the reason the Bank was not receiving the payments was because, while Mynatt had changed the payment destination in his computer, the finance office in Pennsylvania that mails the checks had not changed the payment destination in its computer. See Mynatt's June 11, 2001 e-mail, attached as App. 070 to DPFUF. He went on to inform the Bank that he

[3] There is no evidence in the record to controvert or dispute that the Customs Service's Office of Chief Counsel reviewed and approved the Notice of Assignment, and therefore the Court should rely on the exchange of letters between Mynatt and the Bank, as buttressed by the Declaration of Bellamy, to support a finding that the Office of Chief Counsel did, in fact, review and approve the Notice of Assignment.

was going to advise the Pennsylvania office to change the payment destination. *Id.* This is an admission that Mynatt, as the contracting officer, had recognized and accepted the assignment. If Mynatt believed that the Assignment was invalid, or that he had never assented to the Assignment in the first place, he clearly could have informed the Bank instead of blaming the problem on a lack of communication between his office and the Pennsylvania office.

Mynatt's tacit admission of the validity of the assignment is further evidenced by the subsequent letter Mynatt sent to the Bank on July 4, 2001, in which he informed the Bank that "*the reason progress payments for All Star Iron Works have not been forwarded to you bank*" is because the electronic funds transfer information had not been provided. See Mynatt's July 4, 2001 letter, attached as App. 073 to DPFUF. Again, Mynatt did not dispute the validity of the Assignment or dispute whether he had assented to it or not; rather he just blamed the lack of payments on a paperwork glitch.

Finally, Mrs. Bellamy has testified that in June 2001, when the Bank found out that Defendant had been making payments directly to All Star in violation of the Assignment, she spoke to Mynatt's supervisor, Lee Sullivan, who at first told Bellamy over the telephone that the Bank had not completed the Notice of Assignment properly. Bellamy Dec. at ¶6 (App. 63-64). But then the Bank, via Aaron Gonzalez's letter dated June 11, 2001, sent Mr. Sullivan copies of everything that the Bank had sent to Customs back in January 2000 and after Sullivan received and reviewed that documentation, Sullivan called Bellamy and personally told her that the Bank had, in fact, completed the Notice of Assignment properly, and admitted that the Notice of Assignment was valid. Bellamy Dec., at ¶6 (App. 63-64).

As a result, and based on the totality of the circumstances, the Court should find that Defendant recognized, approved and assented to the Assignment between All Star and the Bank,

and rule that the Defendant thereby waived any complaints it had about the adequacy of the Notice of Assignment.

**D. LIMITATIONS**

Defendant has moved for summary judgment on the basis of the applicable six (6) year limitations period. This suit was filed on June 6, 2007. Thus, the Defendant argues that Plaintiff's claims premised on payments by Defendant directly to All Star made *prior* to June 6, 2001 are barred by limitations. Defendant admits that Defendant made additional payments to All Star in violation of the Assignment *after* June 6, 2001 (in the total amount of $168,035.19) and does not assert that Plaintiff's claims based on those payments are barred by limitations. See DPFUF ¶25-26.

Plaintiff agrees that its claims accrued 'when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action.' " *Goodrich*, 434 F.3d at 1333 (quoting *Hopland*, 855 F.2d at 1577); *see also Bowen v. United States*, 292 F.3d 1383, 1385 (Fed.Cir.2002).

But, the law is also clear that a claim only accrues ***if the plaintiff knew or should have known of the existence of the events fixing the government's liability***. *Goodrich*, 434 F.3d at 1333; *Hopland*, 855 F.2d at 1577; *Kinsey v. United States*, 852 F.2d 556, 557 (Fed.Cir.1988). This is known as the "accrual suspension rule", which provides that the accrual of a claim against the Government is suspended until the claimant knew or should have known that the claim existed. *Young v. United States*, 529 F. 3d 1380, 1384 (Fed. Cir. 2008)(citing *Martinez v. U.S.***,** 333 F.3d 1295 (Fed. Cir. 2003). To achieve such a suspension the Plaintiff must either show that the defendant has concealed its acts with the result that the plaintiff was unaware of their existence or it must show that its injury was inherently unknowable at the accrual date. *Id.*

Importantly, ***"[i]t is a plaintiff's knowledge of the facts of the claim that determines the accrual date."*** *Id.* at 1385 (citing *United States v. Kubrick*, 444 U.S. 111, 122 (1979). This is entirely similar to the discovery rule, where the federal circuits have held that a plaintiff "**cannot have notice of a claim unless [he is] aware of some evidence tending to support it**."[4]

As the movant for summary judgment, Defendant bears the burden of proof to demonstrate, with admissible evidence, when exactly Plaintiff knew or should have known that Defendant was making payments directly to All Star in violation of the Assignment. Plaintiff plead in its Complaint that it did not discover that Defendant was wrongfully paying All Star directly in violation of the Assignment until June 2001. See Complaint at ¶5, 11. Plaintiff also plead in its Complaint that it could not with the exercise of reasonable diligence have discovered Defendant's wrongful payments until June 2001. *Id*., at ¶11.

Defendant has failed to satisfy its burden on limitations because it has absolutely failed to present competent evidence of when Plaintiff obtained "knowledge of the facts of the claim" so as to determine the accrual date. *Young v. United States*, 529 F. 3d at 1385. A review of the evidence presented by Defendant reveals that it has presented **<u>no evidence</u>** whatsoever of when Plaintiff obtained knowledge of the facts that would support its claim – i.e., knowledge that Defendant was wrongfully paying All Star instead of Plaintiff in violation of the Assignment.

First Defendant asserts that Plaintiff should have known that Defendant was violating the Assignment because "[t]he contract and delivery orders clearly set out a payment and construction schedule." Motion at p. 12. But this statement is completely unsupported by any competent evidence whatsoever; indeed Defendant does not even cite to any evidence to support this statement. But even if some document somewhere might lay out a "payment and construction" schedule, approved and authorized by Defendant, there is **no evidence** that any

[4] *In re Beef Industry Antitrust Litigation*, 600 F. 2d 1148, 1171 (5th Cir. 1979).

such document was ever provided to the Bank. In fact, the uncontroverted evidence in this case is that the Bank had no information about payments or construction schedules that were authorized or approved by Defendant. PPFUF at ¶14-15.

Next, Defendant asserts that All Star (not the Bank) made requests for payments of Defendant beginning February 2000 all the way through 2001. Again, there is no summary judgment evidence that any of these requests for payment were ever provided to the Bank or that the Bank was ever notified of any of these requests for payment; indeed the only evidence in the record is entirely to the contrary. PPFUF at ¶14-15.

Defendant next asserts that the Bank could have made inquiries of All Star or the Customs Service to determine whether Defendant was violating the Assignment agreement. But Defendant points to no evidence that would have put the Bank on notice as to the need to make such inquiries. After all, the Bank had a valid Assignment approved by the Customs' office of Chief Counsel and signed by the contracting officer Mynatt. The Bank was entitled to believe that Defendant was going to comply with the terms of the Assignment and Defendant has presented no evidence to demonstrate that the Bank, at any time prior to June 2001, had a reason to suspect otherwise. Again the only evidence in the record is that the Bank had no reason to suspect that Defendant was making payments to All Star in violation of the Assignment. PPFUF at ¶14-16.

As for All Star, the Bank had been working with All Star for many years and had never had any problems with All Star. *Id.*, at ¶16. But that belies the point; the whole reason the Bank sought and obtained the Assignment from Defendant was obviously so that the Bank would not have to make inquiries of All Star, or worry about whether All Star was getting paid and depositing the money with the Bank or not.

Finally, and most importantly from the perspective of Defendant's concealment of its wrongdoing, the Bank did make multiple inquiries of Customs in an effort to obtain an accounting on the contract at issue, and was ignored or rebuffed every time. PPFUF at ¶17-23. Bellamy testified that she tried on several occasions, in writing, to obtain an accounting from the Government to find out what was left to be paid on Contract TC-I-96-013 and never got any responses from the Government. *Id.*

Next Defendant asserts that the Bank should have known that Defendant was violating the Assignment because All Star was receiving paper checks from Defendant from March 2000 until July 2001 and "All Star deposited each of these checks into its bank account at [the Bank]". Motion at 12. Once again Defendant cites absolutely **no evidence** to support this blanket statement.

On pages 13 and 14 of its Motion, Defendant lists the checks that Defendant alleges (1) evidence payments on the jobs that were the subject of the Assignment and (2) were "each" deposited into All Star's account at the Bank. As support for these two (2) statements, Defendant cites its DPFUF ¶22 and 23. Those two paragraphs in turn cite as support documents attached as App. 86-114. An examination of those documents attached as App. 86-114 reveal that they are series of unverified, unauthenticated checks allegedly from the U.S. Treasury Department and allegedly made out to All Star. Importantly Defendant has not attached any affidavit or deposition testimony to authenticate these documents, or to describe what they are or why they are relevant. Plaintiff could object to their admission on this basis alone.

But even beyond the technical imperfections in Defendant's offer of proof, these series of checks provide absolutely no evidence to support Defendant's statements that (1) they constitute evidence of payments on the specific jobs that were the subject of the Assignment and (2) were

"each" deposited into All Star's account at the Bank. Thus these checks do not in any way constitute evidence that the Bank could have or should have known that Defendant was violating the Assignment. In fact, there is **no evidence** that these checks even correspond or relate to the Assignment or that they were ever deposited into the Bank.

This point was made by Mrs. Bellamy when some of these checks were presented to her in deposition. She testified that there was no way she could tell from the checks whether they related to the jobs that were the subject of the Assignment. PPFUF at ¶10. She also pointed out that at the same time that All Star had contracted with the Government on these jobs, All Star also had several other federal jobs underway at the same, which jobs were not subject to the assignment. PPFUF at ¶11-12. Thus, without more information, there was no way for the Bank to be able to distinguish whether a U.S. Government check deposited by All Star in its account with the Bank corresponded to the jobs subject to the Assignment, or corresponded to unrelated jobs. *Id.*, at ¶10-12.

Similarly Mr. Gonzalez testified under cross examination that, since All Star had multiple contracts with the Government running at the same time, in many instances the Government sent checks to All Star that corresponded to payments on several different contracts, but all lumped together into one single check. PPFUF at ¶12. In particular, Gonzalez was shown a check from the Government to All Star written in February 2001 that pertained to work on two (2) different Government contracts, neither of which was covered by the Assignment. Gonzalez Depo. at 37:2-22 (App. 54).

Defendant makes the final argument that the Bank could have just put a "stop" on all Government checks entering the Bank or deposited by All Star, or otherwise "monitored any and all federal checks deposited by All Star". Motion at 12-13. Defendant cites no law that would

require the Bank to monitor every single federal check that a customer deposits just to make sure the Government is complying with an Assignment. Again, Defendant has cited no fact, reason or basis that would have justified or required the Bank to start monitoring checks coming into and out of the Bank. Defendant has the burden on summary judgment to present evidence of facts that would have triggered the Bank's duty to investigate or monitor to ensure the Government's compliance. Defendant has not satisfied its burden.

The only evidence presented in this case as to when the Bank discovered facts that would have put it on notice of Defendant's non compliance is the testimony of the Bank's representatives. Mrs. Bellamy testified that around June 2001, the Bank's examiners from the Office of the Comptroller of the Currency ("OCC") discovered during their audit of the Bank that the Government had been making payments directly to All Star. PPFUF at ¶9. At that point, in June 2001, Bank Vice President Aaron Gonzalez ("Gonzalez") was assigned by the Bank to investigate the file. *Id.* That led to Mr. Gonzalez's letter to Mynatt of June 6, 2001.

The bottom line is that the Defendant has presented no evidence to show when, prior to June 2001, the Bank gained "knowledge of the facts of the claim", i.e. gained knowledge that Defendant was paying All Star directly in violation of the Assignment, so as to determine the accrual date. *Young v. United States*, 529 F. 3d at 1385. The only evidence of the accrual date is June 2001, and therefore summary judgment on the basis of limitations must be denied.

**PRAYER**

WHEREFORE, PREMISES CONSIDERED, Plaintiff TEXAS NATIONAL BANK f/k/a MERCEDES NATIONAL BANK requests that the Court DENY Defendant UNITED STATES' Motion for Summary Judgment.

Respectfully submitted,

**CASTILLO SNYDER, P.C.**
Bank of America Plaza, Suite 1020
300 Convent Street
San Antonio, TX 78205
Telephone: (210) 630-4200
Facsimile: (210) 630-4210

By: s/Edward C. Snyder
EDWARD C. SNYDER
State Bar No. 00791699

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document will be sent to the following counsel of record by Electronic Filing:

Joan M. Stentiford
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
202-616-0341 phone
202-514-8624 fax

ATTORNEY FOR DEFENDANT

on this the 27th day of August, 2008.

s/Edward C. Snyder
EDWARD C. SNYDER