UNITED STATES COURT OF FEDERAL CLAIMS

TEXAS NATIONAL BANK f/k/a MERCEDES )
NATIONAL BANK )
)
VS. )Court No. 07-00355C
)Judge Firestone
UNITED STATES )

**********************************************************

ORAL DEPOSITION OF

CHERYL BELLAMY

TAKEN MARCH 26, 2008

**********************************************************

ORAL DEPOSITION OF CHERYL BELLAMY, produced as a witness duly sworn by me at the instance of the Defendant, taken in the above-styled and numbered cause on the 26th day of March, 2008, from 9:37 a.m. to 12:33 p.m., before Sindy Sanders, Certified Shorthand Reporter, No. 5974, in and for the State of Texas, reported by stenographic method, at TEXAS NATIONAL BANK CONFERENCE ROOM, 201 S. Texas, Mercedes, Texas, pursuant to the Rules of the United States Court of Federal Claims (and the provisions stated on the record or attached herein).

one of the ways to perfect an accounts receivable loan is to put people on notice. Perfection has to be done by putting people on notice that you've -- that you have the lien. And that's why this was done.
Q. So at the time -- so the bank made a loan to All Star Iron Works?
A. Yes.
Q. Sometime before -- well, when was that -- was that -- was that in January of 2000, or would that have been earlier?
MR. SNYDER: The loan?
Q. (By Ms. Stentiford) The loan, yes.
A. I really don't know what date it was.
Q. Well, I guess my question was --
A. It likely was in January when the assignment was done. Because it's normal -- it is typical that when you make a loan, that you do your lien perfection documents at the same time.
Q. And so the -- I guess my question was, the collateral for the loan was always intended to be these task orders that All Star had with the Customs and Border Protection?
A. Yes. The accounts receivable from those task orders.
Q. How much was the loan for?

A. It was a revolving line of credit. And we had more than one loan outstanding, but the revolving line of credit was at -- I believe, at that particular time, was -- I can't recall if it was $230,000, or $240,000. But we had receivables from Mr. Soto as our collateral -- all of his receivables were collateral on -- we had another line also, and I believe it was for $125,000, and both of those notes were secured by liens on all of his receivables.

Q. But the loan we're talking about here, it was secured by just the receivables from these four task orders; is that correct?

A. No. It was secured by all receivables of -- and this was just -- this was just a notice that we had -- an assignment that those had been assigned to us. And so -- but if you look at the -- if you look at the UCC filing, I am sure that it will say that we had a lien on all of his accounts receivable now owned and hereafter acquired.

Q. Not just from the Government, but from all of his creditors?

A. Yes, ma'am.

Q. And is that your signature on the second page of Exhibit No. 2?

A. Yes, it is.

Q. Now, what's the third page of the exhibit?
A. This is a copy of the -- from what I understand, the task order. They called it a task order that was from the U.S. Customs, and this was what we received as far as the contract for what was to be -- it was for this particular one. There's one here of a task order -- and I don't know the number on it -- oh, yeah, it's up at the top -- it says contract number TC-I-96-013 and it's for $100,000 and it's to build a canopy at the Customs Los Indios Bridge.
Q. We marked this yesterday as Exhibit 18. I'd ask you to look at it, please. It's a nine-page document. If I could ask you to look that over and tell me if you can identify these documents.
A. The one on the top?
Q. Well, all of them.
A. It looks like these are the task orders for -- well, let me see which bridges. We have the original $100,000 for the design Phase One of the canopies at the Customs for Los Indios and that was done in July of '99. And the second document is a -- it's not the original -- it doesn't appear to be the original task order, because it's done -- I'm not sure what the date of the order -- does it say 2010?
Q. That's what I thought. I think it's meant to

be 2000. I think the zero got collapsed there.
A. And I don't know that I've seen this before.
Q. Okay.
A. Because this has got -- this is not the original with the $100,000. This one also has a complete Phase Two design-build for $101,000 on that one.
Q. Okay.
A. This was not the original one. Then after that, we do have the original one for Los Tomates for $100,000 to do the exact same thing, design-build Phase One of the canopies.
Q. Uh-huh.
A. Then the page after that with general remarks, I'm not sure -- I'm not sure. That just looks like some instructions that went along with the task order.
Q. Right. I believe if you flip back to the page right before that that's Bates stamped P0026 in the left corner --
MR. SNYDER: These with the Bates stamps, she's referring to. P0026, you said?
MS. STENTIFORD: Yes.
A. There's one -- P0027? Which one is it?
Q. (By Ms. Stentiford) P0026.
A. Oh, P0026.
Q. In the upper right corner, it says, "Page 1 of

2 documents." So P0027 must be -- it appears to be -- I won't say must be -- appears to be the continuation, which is what it says at the top.
A. Then it just talks about some instructions.
Q. Correct. Okay.
A. Then again, we were with -- then the document that's P0028 is the original $100,000. Again, same thing. They were all the same. Design-build Phase One of the Customs canopies at B&M Bridge. And the page after that, 29, are those instructions?
Q. Right.
A. I assume, for that one. And then we have the canopies at -- design phase -- or construct phase at the Brownsville Port of Entry for $100,000 and then a set of instructions for that one. And then we have another one that I'm not sure that I have seen before. And it's -- it's got the original $100,000 on it for the Brownsville Port of Entry, but it also has a Phase Two. It's dated September of 2000 for $109,668.
Q. In addition to the original $100,000?
A. Right.
Q. Okay. So the -- you're revolving line of credit with -- or All Star's revolving line of credit was secured by just the original of these task orders, so not the --

A. No, ma'am, it was not. Because we had a -- if you look at the -- if you look at the UCC filing, it would have said that we had a lien on all accounts receivable now owned to hereafter acquired. It was never ending until the loan was paid off. So we would have had a continuing lien unless we gave it up for some reason, which we did not.

Q. Okay. So the original of these task orders would have been the original collateral at the time the assignment was executed by the bank and by All Star?

A. Yes.

(Exhibit No. 22 marked.)

Q. (By Ms. Stentiford) I'm going to show you what was marked as Exhibit No. 22.

MR. SNYDER: Has this ever been produced before? It doesn't have a Bates label on it.

MS. STENTIFORD: I just got it yesterday.

MR. SNYDER: Oh, okay. It doesn't appear to be a complete copy either, does it? It starts at 14 at the top, line under 14, like there should have been a 1 through 13. No?

A. Let me see if I understand what this document is. And I'm speculating, because I've never seen it before. But my understanding is that Mr. Soto had a -- he was a -- what do you call it -- with the SBA -- an

approved minority contractor. And this -- I don't know what this document is, but I see that it was -- it has an amount of -- it looks like -- is that $3 million? And it was signed by All Star and it's prime contract number is TC-I-96-013. And besides being signed by Mr. Soto, it's also signed by Mr. Fred Manzanares as the contracting officer with SBA. And my understand is that he was awarded, as a minority contractor, a contract to do $3 million, I guess, according to this, worth of business for the -- it doesn't -- oh, it is for U.S. Customs. Yes. It is for U.S. Customs. And it's all under the prime contract number of TC-I-96-013. And I don't know what the subcontract number means. But that's what I can glean from that document.

Q. (By Ms. Stentiford) And you said you had never seen this before. It was not provided to you at the time the assignment was --

A. No, I had not seen this document before.

Q. The contract number, TC-I-96-013, if you look back at Exhibit No. 18, is that the same overarching contract number that is on all those task orders that we identified previously?

A. Yes, it is.

Q. So would that lead you to conclude that this is part of -- that Exhibit 22 is part of the overarching

contract under which all of the task orders were issued to All Star?
A. Yes.
Q. When the bank entered into the assignment -- first let me show you Exhibit No. 4. Can you identify document No. 4.
A. Putting U.S. Customs -- it is a Notice of Assignment putting U.S. Customs on notice that Mercedes National Bank had a lien on contracts with the number TC-I-96-013 with four, what came to be called as task orders, as being assigned, and that payments due should be made to the assignee.
Q. Which is the bank?
A. The bank.
Q. It says -- is that your signature there about halfway down the page?
A. Yes, it is.
Q. The last paragraph right above your signature says, "Please return this letter signed by the person acknowledging receipt." Was it, in fact, returned to you?
A. Yes.
Q. And those are the signatures there on the bottom of Exhibit 4?
A. Yes.
Q. Why did you send this to the Customs Service?

A. Because that's the way that you put them on notice that the bank has a lien and that payment should be made to the bank.
Q. And it's addressed -- addressed by you to U.S. Customs Service. Did you have a particular person that you were sending it to?
A. I guess if I addressed it to U.S. Customs Service, then that's where it went to.
Q. And you just sent -- well, you just sent one to the address that's listed there on Exhibit 4, the 6026 Lakeside Boulevard?
A. I really can't tell you. I mean, what I have here is this document in front of me.
Q. You don't have any independent recollection of sending it? What I am getting at, Ms. Bellamy, is that the governing statute here requires that notices of assignment be sent to the contracting officer and to the disbursing officer, and I'm trying to find out if you recall if this was sent to both of those officers or not.
A. We had done these numerous times in the past and never had a problem with the way we had done them. So the only thing I know is what I'm looking at here. So I really don't know if another copy was sent. The -- it does indicate that there's two copies. There's two copies sent. But in the last paragraph --

Q. "Copy is enclosed for the records." Right. So you don't recall at this point -- well, let me ask, do you recall at this point whether the bank's policy in dealing with assignments of government contracts was to send notices to both the contracting officer and the disbursing officer?

A. I don't recall what the policy was. I know that we had copies of the -- of the regulations in the file as to what was supposed to be done, and I assume we followed the regulations. But we did have copies of those, so I don't know -- I really don't know what was done there.

Q. Okay. Thank you.

(Exhibit No. 23 marked.)

Q. (By Ms. Stentiford) I'm going to show you Exhibit No. 23, please, if you'd look at that.

MR. SNYDER: This is what? 23?

MS. STENTIFORD: Yes.

A. Okay.

Q. (By Ms. Stentiford) Can you tell me what this document is.

A. It appears to be a response to my request on January 14th, 2000 putting U.S. Customs on notice that the bank had an assignment and we would like to have payments made to the bank indicating that they had received this,

and as soon as legal counsel had approved it, that it would be signed and forwarded back to the bank.

Q. And it's signed by a William Mynatt. Do you remember who he is or was?

A. Yes. I do know who -- I do know who he is or was. I have not talked to him, but I know who he is.

Q. Okay. And who was he?

A. He was the contracting officer in charge of this -- these task orders that were assigned to the bank.

Q. Okay. And it says, "When legal approval" -- the middle paragraph of the letter says, "When legal approval is received, the acknowledgment will be signed and forwarded." Did that happen?

A. Yes, it did, which led me to believe that it was done properly.

Q. "And the acknowledgment will be signed and forwarded." Is that the document that we just looked at that's marked as Exhibit No. 4? Is that your understanding?

A. Yes, it is.

Q. And that's Mr. Mynatt's signature there at the bottom -- or it appears to be Mr. Mynatt's signature?

A. Yes.

Q. So that's what you took to be the acknowledgment referred to in Exhibit No. 23? Or is it?

I'm asking you.
A. Yes.
Q. What happened next? What happened after you received the acknowledgement that's Exhibit No. 4? And that was -- well, the acknowledgment itself isn't dated, is it? The notice -- your part of the notice is dated January 14th. Exhibit No. 4 doesn't indicate when it was returned to you, does it?
A. I don't see that it does. It most likely was faxed over or something, but I don't know how the bank received it. I can't tell from that document. Is that -- I don't know what that is.
Q. Exhibit 23, the letter informing you that it would be -- that the acknowledgment would be sent to you when legal approval was received is dated January 24th. So it would be reasonable to conclude that it was shortly after January 24th, 2000?
A. Yes, ma'am. I don't know about shortly, but I know it was after.
Q. What would have been the next step for the bank in terms of ensuring that it received payment under the acknowledged assignment?
A. We -- we did have a bank account where Mr. Soto -- a business operating account where he maintained his -- his accounts. And the majority of these funds on these

jobs were probably advanced, because we had a line, remember, of $240,000. We also had the $125,000. And we had an $85,000 CD that we advanced for the CD to be pledged on the bond. So that $85,000 came out right off the bat, off of the -- out of the $125,000. And then the rest of it, we had four jobs that we thought were $100,000 each and we had a line of credit of $240,000. So those fund were probably advanced. And I don't know exactly when, but they were probably advanced pretty much within the first six months.

Q. You say advanced. You mean given to --

A. Given to him, but advanced only -- not just advanced to him, but advanced for payment for work on the bridge. Because we did monitor to make sure that when funds were taken out of that account, that they were -- they were used to either pay subs or suppliers or payroll for his people. So those monies went out fairly quickly on his line of credit.

Q. And you say his line of credit. You mean Mr. Soto's line of credit?

A. Mr. Soto's line of credit on these jobs.

Q. Okay. And in terms of when -- when Mr. Soto would be -- would be paid progress payments, and I understand the bank monitors that he used the money for the purpose that he said he wanted it for --

to All Star Iron Works." So they must have seen these copies before June 6th, 2001. I'm asking if you think that's a fair statement -- well, let me not ask you that. Do you know -- did you see copies of checks made out directly to All Star Iron Works on any of these task orders prior to June 6th, 2001?

A. No.

Q. Mr. Gonzalez testified yesterday at his deposition that he started looking at this file a couple of months before June 6th, 2001. Did you assign him to review this file?

A. I may have.

Q. And how would it have come to your attention to tell him to review the file, that the file needed reviewing?

A. I believe that the bank examiners had been in the file -- in the bank, and they are the ones that picked up on the fact that some of the checks were coming in and they were not made jointly payable.

Q. Is that the Office of the Comptroller of the Currency?

A. Yes.

Q. Do you have any idea how it came to their attention?

A. They were in doing an audit.

Q. And do you remember when that was?
A. It was probably shortly -- shortly before June. They came in to do an audit, an annual audit, but it was typical that they would come in on a quarterly basis sometimes and review files.
Q. And do you know what action the bank took to ensure that it received payment -- it received payment due to -- otherwise due to All Star on these task orders between the time the assignment was executed, January 14th, 2000 and the date of this letter, June 6th, 2001?
A. Typically, sending and putting somebody on notice and getting an assignment and getting them to agree to that and sign to that is all that's needed. Again, I indicated that the bank -- the bank could and did monitor the disbursements from the account and we made sure that funds were used only for this project and -- or other projects that -- upon which we had a lien. So we assumed that if work was being performed, that monies would be sent. And it doesn't always happen that -- that the customer will bring the monies in to the bank. Although, you know, we had worked with Mr. Soto for many years, it just doesn't always happen. And that's the reason that you put somebody on notice, to ensure that the payments are brought in to the bank.

account 10334-1.
Q. And that was its account at Mercedes National Bank?
A. Yes.
Q. Did the -- and is that -- can we make the same statements about the checks on Page 75 and 76?
A. I assume they're the same. I mean, I haven't studied to see that they're -- I have a tough time reading these things. But it looks to me like you're implying that it's the back of the check for each one of these. I don't know how you would tell. Maybe somebody else who works in the teller line would know how to tell that, but I don't know how to tell if it's the same one.
Q. All right. The check that's dated June 16th that's Page 73 is for $25,409; is that correct?
A. Yes.
Q. Then the check that's on Page 75 is dated August 20th, 2000 for $31,200.60?
A. Yes. 60-something cents.
Q. And then the check on Page 77, December 15th, 2000 for $70,244-and-50-something cents, do you see that?
A. Yes.
Q. And then, finally, on Page 79 is a check dated January 30th, 2001 for $56,405, and looks like, 65 cents. Is it the bank's position that all of these checks should

have been paid to the bank and not to All Star?
A. It's not the bank's position that they should have been. They should have been made payable to the bank so that the bank would be able to control what happened with the funds.
Q. So when these checks were presented by All Star for payment -- for deposit, there wasn't anything the bank could have done to prevent them from being deposited, given the fact that there was an assignment? The bank has no way of monitoring --
A. Not unless you specifically know it's coming in.
MR. SNYDER: And I'm going to object. You are assuming facts that are not in evidence, whether or not these checks are actually part of the assignments or whether -- partially part of the assignments. Because I don't believe there's anything on the checks that show which contract they apply to.
Q. (By Ms. Stentiford) I thought your testimony earlier this morning was that you had --the bank had the assignment attached to all of All Star's receivables.
A. Well, these are -- these are just checks that came from the United States Treasury. I don't know what they're for.
MR. SNYDER: Let me just object, because

you're misconstruing her testimony. Her testimony was that she had UCC filings -- liens as to all the receivables, not a government assignment as to all the receivables. I believe the government assignment is only to four contracts.

Q. (By Ms. Stentiford) So the fact is, the bank didn't have any way of knowing when All Star was going to be paid -- when progress payments would be made to All Star?

A. No. Because the only way we would know is if we had gotten some kind of notice from somebody that they were coming in. We had no idea when these payments were coming in. And when they -- when they did come in, it might be sometime afterward, if it came to our attention that it came in, but the funds were already used.

Q. Couldn't the bank have required All Star to provide it with its schedule of operations? All Star must have had some idea of when it was going to be paid.

A. On this particular contract, it was very difficult to determine when anybody was going to get paid. There were times when he would submit -- there were times when he would submit requests for payment, and I particularly am aware of -- a year-and-a-half would go by before he would get payment because there was so much confusion as to what should be paid on those change

orders. So he -- he would do the work, the bank would provide the money to do the work, and we would assume that the monies were still out there, but it might be two years down the road before he got paid. And that was the case in several instances. And the bank never really knew what was out there that was still to be paid. We tried. We made an attempt several times to determine what was still there. You remember that this was a revolving line of credit and we loaned money based on 80 percent of contracts that were still outstanding. And if we did not get something to show us that payments had been received, we assumed that the money was still to come in.

Q. Did you ever request Mr. Soto that he tell you when he got a check from the government on any of these assignments at any point after --

A. Not -- not -- after we started having these problems. Then it became obvious that we had problems. But up until this time, we had done what any prudent banker would do to take steps to ensure that we were getting the funds or were aware of the funds and that we could control the funds. And that was by making an assignment and asking the government to make those checks at least jointly payable. If the checks had been made jointly payable, he could not have deposited them into the account without getting our approval. And that was the

reason we wanted that. We had no control over what he did with those funds. We don't even know if all the funds came into this bank.

Q. But you knew at least some of the funds came into this bank?

A. Well, we knew that -- we knew that -- we weren't there. We did not typically make it a policy to go in and monitor his everyday account for deposits that came in there. That would be impossible for us to do. I mean, every -- checks that come in here are processed some place else. I mean, I guess if he came in and physically deposited them and somebody knew him. But we had no reason -- we had no reason to do that, because we had gotten the approval from the government that they were going to make the checks jointly payable. Once we realized that that was not happening, well, then we took better control. But this was after things had already happened.

Q. And that -- that situation existed -- the assignment is dated January of 2000, Mr. Gonzalez's letter referring to checks that he received. At some point between January 14th, 2000 and June 6th, 2001, that's a year-and-a-half. There was -- the bank was powerless in a year-and-a-half to take any action?

A. We weren't powerless. We just -- we didn't see

any reason to do anything. We were -- we were supplying funds and we were very prudent with where the funds went. The funds went into the jobs. And we -- we could show that. I mean, you know, we can go -- because we did have -- we did not allow checks to be written on that account unless we knew where the funds were going. So we knew that we had an assignment on these contracts. We knew those contracts were still out there. So we knew that, eventually, we were going to get paid, particularly since we felt like we had control of the funds, but because of the fact of the assignment.

Q. But with as much care as you described you disbursed the funds, only for specific purposes, only upon verification of those specific purposes, you made no effort to ensure that the money would be paid back to the bank in accordance with the assignment?

A. Remember, it is a revolving line of credit. There's no way that $240,000 is going to -- to even pay for $400,000 unless that money is revolving. It ended up that these jobs were not $400,000, it was a million dollars plus, which we were not aware of, and there were a lot of change orders that happened in there which everybody lost control of. And I made several attempts to try to even get a handle on where we were. So it's a revolving line of credit. The way a revolving line of

credit works is, I advance the funds based on the fact that I had $400,000 that I knew was coming back. I advanced $240,000, plus another $125,000, or at least $85,000, I know, which was the $85,000 for the CD that was put up on the bond, which, by the way, was eventually depleted also somehow. I advanced those funds. That money that I advanced went into the bridges. Mercedes National Bank paid for the bridges. And we still to-date have those loans outstanding on our books, despite the fact that monies came in. The monies came in because we started something. We -- we had an obligation to finish it. Mr. Soto had an obligation to finish it. The only way that was going to get finished was if Mercedes National Bank would continue to provide the funds. So if funds came into his account, then what we would do would be to look to see -- he still has to complete those jobs. So we would still see if we would pay checks to complete those jobs, which we did. So we put -- I don't know how much money we put into those jobs. We put $750,000 into those jobs. And we still have on our books the original monies, because it was a revolving line of credit. And we were not able to control -- the reason we weren't able to control it was because U.S. Customs could not provide this bank with numbers as to the amounts that were left to be paid on those jobs. And I asked several times. I dealt

with Mr. Lee Sullivan trying to get that. Because that's how we make our determination whether or not we're going to advance more funds, whether or not there is at least 80 percent of the value of contracts left, you know, on our revolving line.

Q. Right. But -- I mean, I understand that. I understand the bank's frustration here. I understand that the bank's out a lot of money thanks to All Star. But, I mean, here's a check dated December 15th, almost a year after the assignment was made, for $70,000. It doesn't -- wouldn't it have been possible for someone -- for the bank to have put a hold on government checks being deposited into All Star's bank account, if only for the purpose of ascertaining what that $70,000 was for, whether that was part of the assignment? That's a lot of money.

A. We didn't do that. We -- we asked the government to make checks jointly payable. And if we had received it then, then maybe we would have taken a look to see what was happening. But we never -- we never -- we never got notice during that year-and-a-half period of time. And it was not uncommon for us -- I mean, this -- a bank has more customers than this one customer. And you just can't -- you can't -- you can do so much. And we felt like that by putting the government on notice and them agreeing to make the checks jointly payable and

monitoring where the checks were going to make sure that those monies were going into the bridges that we had the contracts on, that we should be okay, until a year-and-a-half later when we found out that -- and I think the problem was that nobody, at that point, then, knew where we stood on what was left to be paid on these jobs. And to this date, I have not received an answer, although I have asked in writing and I have asked numerous times. And I have never, to this date, received anything to tell me what was still left to be paid on those jobs, although I left in 2005 and I think people gave up after that.

Q. Did the bank have other lines of credit, revolving lines of credit, for $240,000?

A. I'm sure they did.

Q. I mean, was All Star -- was All Star one of the bank's larger clients?

A. I don't know if you'd say larger. We had clients that owed us $800,000 loans. So they weren't our largest client.

Q. Among the largest ten clients?

A. No. I wouldn't say so, no. We were -- well, we had a list of the largest clients and they were on the list of -- what we did that was $75,000 and over. But they weren't our largest client.

A. Well, all of them have that contract number.
Q. Right. So you have not seen this document -- either of these documents before?
A. I mean, I can't say that I have or haven't. I mean --
Q. Does this document, the face of Exhibit 25, does this suggest to you that Mr. Soto was capable of requesting payment, progress payments, on -- from the government?
A. That's a pretty slim amount of information, so I wouldn't be able to tell you. I mean, for the kind of monies -- was he requesting $7,000? I don't know. I mean, I don't know what was required for him to request payments. But this is not very much information. I mean, I certainly wouldn't pay any money based on that piece of paper.
Q. That's not my point. My point is that Mr. Soto understood that he could ask the government for payment, and it seems to me that the bank could have asked to be copied on any such requests, whether they took this form or any other form.
MR. SNYDER: Objection. Calls for speculation that the bank even knew these things were being submitted to the government.
A. No, I didn't know when they were being

submitted. But what would lead me to believe that they would do anything different from what they did on the assignment request?

Q. (By Ms. Stentiford) If you'll look back at Exhibit No. 5 and I want to ask you to look at the second page of Exhibit 5. It's Bates stamped at the lower left corner as P0011. Do you know whose handwriting that is?

A. No. I sure don't.

Q. So you don't know how this document came into existence?

A. I've never seen it.

Q. And it's not dated, so there's no way to tell anything.

A. I really don't even know what it is.

Q. Well, it was produced to me from your attorney, so, apparently, it was in the bank's file. But I agree, if you don't recognize the handwriting, I don't know what you could say about it.

MR. SNYDER: Can we go off the record for a minute?

(Short break.)

Q. (By Ms. Stentiford) I'm going to show you what was marked yesterday as Exhibit No. 7.

A. Okay.

Q. Can you tell me what this document is.

A. This is July of 2001 and the original assignment was January of 2000. So that's over a year-and-a-half. And as I testified previously, the monies had already been given out. And we expected under those terms that the checks that were sent that were not electronic -- because at this particular time, I don't know -- we didn't have a requirement and nobody told us that there was a requirement. Because we asked, "Is there anything else we need to do?" And nothing else was told to us that we needed to do to perfect our lien. And we just anticipated that this is how we would get the money.

Q. I'm sorry. I didn't mean to interrupt you.

A. We would get the money, because the checks, at the very least, were to be made jointly payable to Mr. Soto and to Mercedes National Bank. At this particular point, you will see all kinds of correspondence and I know I had lots of conversations with U.S. Customs after this, just trying to get this account worked out because it was a mess.

Q. Okay. And just so the record is clear, this that you're referring to is Exhibit 10?

A. This is Exhibit 10, which is the -- just the -- satisfying the government's requirement that the payments be transferred electronically.

Q. Is there any way to have payments transferred

electronically to two payees?
A. I don't know.
Q. If you look back at Exhibit No. 7, which is Mr. Gonzalez's letter providing Mr. Sullivan with the assignment and the UCC documents and the letter of approval from Customs, was -- what was the follow-up to this letter? What did Mr. Sullivan do in response to this letter, to your knowledge?
A. I don't know what Mr. Sullivan did.
Q. Well, did the bank -- did you ever -- well, what -- so Mr. Gonzalez provides him with documents and did anything happen?
A. I had conversations with Mr. Sullivan on the phone numerous times and I had various correspondence with him and his secretary, Ms. Beverly Tyree. And we sent these documents, and it was Mr. -- once they had received these documents, it was Mr. Sullivan's opinion that the assignment had been done properly. And in addition to -- in addition to the fact that the assignment had been done properly, Mr. Sullivan and I had conversations about how much was still left to be paid on the contract, because there was still our concern that we -- we had lost control of all that. And Mr. Sullivan, numerous times, had indicated he was going to provide that to me, which he never did do. And I think it was because he didn't know

was not going to allow Mr. Soto to complete that contract because he had not finished those other jobs, and then Mr. Sullivan changed his mind because he realized that part of the reason that those other jobs had not been completed is because he had never been able to provide the bank with the information that they needed, that we needed, to be able to provide the funds to complete those jobs. Mr. Sullivan agreed, despite the fact that the bond had cancelled on that. He agreed to allow us to continue that job using a funds management company, and at the same time, we negotiated a contract to finish that $348,000. And I'd just like to point out that all three -- all four of those jobs were the same job and the same time frame. And when we finally got Mr. Sullivan to come in, because Mr. Mynatt could not provide us with all the change orders and the amounts that were owed on those or amounts that should have been paid on those contracts, we came up with an amount that was -- was a reasonable amount that Mr. Soto should be paid of $348,000. And if you look at those other contracts, they were all in the neighborhood of $200,000, which means that something happened, that something did not get paid properly on those other three contracts. Because if one contract was worth $348,000, why would three of them be worth $200,000 each? So there was a mess and Mr. Sullivan indicated to me that the

reason he was taking over and renegotiating that contract with me was because Mr. Mynatt had dropped the ball. He had been transferred over to Puerto Rico or somewhere and he had had several jobs that he was not able to monitor properly and that was the reason that we had the mess that we had.

Q. Okay. I'm going to show you Exhibit No. 20.

A. Okay.

Q. Is that -- well, I'll just ask you, can you tell me what Exhibit 20 is.

A. My letter to Mr. Sullivan explaining or -- explaining the situation with the three jobs -- three of the bridge jobs, being Los Indios, Los Tomates, and Gateway, being almost complete, although we have no idea how much is left to be paid on those jobs although the work has been done and asking for a recap, and then asking that he allow Mr. Soto to complete the one on the B&M job since we had the contract on it and to use the funds management company to monitor the payments on those, and Mr. -- acknowledging Mr. Sullivan's requirement that in order for him to allow Mr. Soto to complete that last job, that the other jobs be completed, and my comment that Mr. Soto is very willing to complete these jobs and the bank can make the funds available to him, but clarity will first have to be brought to funds remaining on the jobs

MR. SNYDER: He's switched banks.
A. Wells Fargo Bank. Yeah. He wants to get the money and it belongs to the bank. Do you see what I mean about why you have to have them jointly payable? But I wasn't working here.
Q. (By Ms. Stentiford) I understand that. And so I guess you can't tell me what the bank's current position is on the status of the assignment executed on January 20th -- January 14th, 2000?
A. No. Maybe he can tell you (indicating to Mr. Snyder). I was called over here to answer your questions about what I could remember, so --
MR. SNYDER: Can we take a break?
(Short break.)
Q. (Ms. Stentiford) I'm going to show you what was marked yesterday as Exhibit 11. Can you tell me what Exhibit 11 is.
A. It's a memo to me from Mr. Ralph Lauder, who was a member of the board of directors at the bank and a retired military officer and a consultant now for the government. And he had -- he had not been on the board at the time of the inception of these loans, but sometime -- and I don't remember when -- well, this is dated December of '02, so it might have been sometime in '02 that he became a member of the board. And, of course, we were

struggling with this loan and Mr. Lauder thought that with his background with working with government -- government contracts, that he might be able to get some help in getting the information that we needed on this particular loan. So he submitted a request under the Freedom of Information Act for all of the information that the government had related to these particular task orders on Page 2.

Q. Which is Bates stamped 34 in the lower left corner. And in the middle of that page, there's a list of task order numbers. Do you see? In Mr. Lauder's letter to you -- I'm sorry -- not to you -- to the government?

A. Yes.

Q. And the first four of those appear to be the ones -- the same ones that were on the assignment that the bank executed in January of '04; is that correct?

A. I would have to compare them. I don't dispute that, but I don't really have it in my mind, what those --

MR. SNYDER: What exhibit is it?

MS. STENTIFORD: It's Exhibit 4.

A. Exhibit 4?

Q. (By Ms. Stentiford) Yeah.

A. Let me see. Yes. I think you're correct.

Q. Okay. Did you ask him to do that, or was this his idea?

assuming this is Mr. Lauder's report, did the bank use it for anything?

A. No.

Q. Do you remember -- well, you said there was a lot of information that was received in response to the FOIA request. Was there ever any action that came out of information that was received in response to that that the bank took?

A. I reviewed the information and I was particularly interested in the information which talked about monies that were still remaining on the contracts. And there was a particular lady, and I cannot remember her name, that was in charge of that information, and I did talk to her at one time with Customs. And I think she was in charge of keeping up with -- or she had been given the task, once this came up, with keeping up with what was owed on those contracts. As I recall, there were monies that were still owed, some substantial monies, but it was in conflict. Even she was not aware -- she could not tell me, still, what was owed on those contracts. And I'm sorry, but I can't remember the lady's name, but it was somebody there at -- and I think it was in Indianapolis, but I'm not sure about that either.

Q. Okay.

A. It never got resolved. And then I, of course,

see if that actually occurred.

Q. Okay. And I'm going to show you what's marked as Exhibit 17, and I believe this is also part of the response to the FOIA request. There are a lot of documents like this in the file that were produced to your attorney that are from the government's files. My question to you is --

A. This is from the government's file?

Q. There are documents -- there probably is another copy of that exact thing in the government's file. There are certainly progress reports in a similar fashion. My question is, these were routinely -- apparently -- I don't want to introduce all of them as exhibits and have you look at all of them -- this is sort of a representative document -- my question is, did the bank have this information contemporaneous with the work reflected being done on that document?

MR. SNYDER: Objection. Do you mean did the bank actually receive progress reports like this?

MS. STENTIFORD: Yes.

Q. (By Ms. Stentiford) Did the bank actually receive progress reports like this one from Mr. Soto?

A. We received some of them, but you couldn't rely on them. I mean, it is a piece of paper with some numbers on it, and nobody has signed it except for Mr. Soto.

Q. So you did actually have some of these documents? I wasn't sure -- I wanted to clarify your earlier testimony. That's why I'm asking.
A. Yeah. I think we probably received some of these.
Q. But you wouldn't have found them helpful in terms of gauging when a payment might be expected?
A. No. As I told you, he may have submitted this request for a payment and it might have been a year-and-a-half later when he got it.
Q. And how do you know that, that it would have taken a year-and-a-half, potentially --
A. Because it did.
Q. Right. But how do you know --
A. Because if he did bring in one of these and he told me that he was expecting to get monies, you know, "I'm going to be getting monies," so that I would advance him money to continue with the job, and then I didn't receive it.
Q. Did that happen?
A. Yes, it did.
Q. Do you remember when exactly that happened? I mean, did it happen more than once?
A. Yes, it did happen more than once. I remember a particular incident on a change order -- and it happened

regularly. Because the problem with the way this -- these contracts were done, which I was not aware of, that that's how it would be handled at the beginning, was it was a design-build. So the $100,000 that was on the original contract did not stay $100,000, as we saw. And again, I wasn't aware until we got into this and I actually started having to look into this to see why we weren't getting monies on these jobs that, according to Mr. Soto, when the government decided they were going to do a change order on one of these, and maybe it was -- they were going to put in a booth that was not part of the original canopy, somebody would -- somebody, an inspector or somebody over there, would come and tell them what it was they wanted, and they would give them -- you know, particularly give them a price or somebody would set a price for what they were going to pay for that, but in order for Mr. Soto to get paid, the architect then had to -- they had to get the architect involved and the architect had to come and certify and agree to -- that these were the amounts that would be paid on these orders. And I remember one instance, and I don't remember if it was a misting system or something that they were going to be putting in on one bridge, that Mr. Soto had already done the work, because they had asked him to do the work, and there was a lot of pressure put on Mr. Soto because of time frames because

things had taken so long. And Mr. Soto did the work, the bank provided the money to do the work, and Mr. Soto had indicated to us that he was going to get paid for that and so could we provide him additional monies, then, so he could continue working. And we went by and went by, along for a year-and-a-half, and we did not receive the funds. And finally, I ended up having to get involved. Because Mr. Soto tried numerous times. He sent numerous documents trying to get the figures right, and Mr. Mynatt or whoever would come back and say, "No, we've already paid part on this and we're subtracting this from that," and so forth and it was a big mess. I finally found out, so I was told, that they weren't going to get paid because the architect had not been paid. Well, of course, the architect couldn't get paid because the bank had not been paid, and the bank wasn't going to put out any more money on those funds. The bank had to personally guarantee payment to the architect so that he would provide the form to show on the change order for work that had been done a year-and-a-half ago so that Mr. Soto could get paid. That was one instance. There were numerous.

Q. That particular incident that you're recalling, was that in 2003? Was that after the funds management company got involved?

A. Well, the work was done prior to that, but it

may have been 2003 when I got involved with it and just -- when I got involved in all of this, trying to collect on these funds. And you have to realize -- you saw my letter. I don't know what date that letter was when I was talking about the financial strain that had been put on Mr. Soto. You cannot complete million dollars jobs without working capital. And he was doing the work, the bank was providing the money, and the government was not sending money.

Q. I think you're referring to your letter of April 10th, 2003 that was Exhibit 20. Is that --

A. About the financial strain? Yes.

Q. Is that correct?

A. Yes.

Q. Thank you, Ms. Bellamy. I don't have any more questions for you.

E X A M I N A T I O N

BY MR. SNYDER:

Q. Ms. Bellamy, you were talking briefly -- you testified a little bit a while ago about these change orders, that there were a lot of change orders on these four bridge contracts, correct?

A. Yes.

Q. And those were change orders -- just so we're clear here, those were change orders as between Mr. Soto

and his company, All Star, and the U.S. Government?
A. That's correct.
Q. Did either -- did the government ever provide the bank with copies or any information about -- that there were change orders?
A. No.
Q. So the bank was never provided with the change orders?
A. No.
Q. Okay. When the bank -- when Ralph Lauder came in and offered to help on this issue with All Star and Customs -- and I believe you testified he did a FOIA request on the government?
A. Yes. That's correct.
Q. Did he do that FOIA request basically to get the information that you had been trying to get out of the government previously about the accounting?
A. I think so, yes.
Q. And I believe that you had testified that you had, on several occasions, talked to Mr. Sullivan, even sent letters, to try to get an accounting of what was going on with these payments out of the government. And did they ever provide you with one?
A. No, they did not.
Q. Now, I want you to look at what was marked

have in their computer." And now he comes and says the problem is not that he -- it's just a courtesy, but he's got the address wrong in his computer, which he will make the change and let them know. But then he says no, the reason that you're not getting them is because they were not done electronically. So he is very confused or making excuses.

Q. Again, if you look back at Exhibit 22, which, apparently, is the actual contract at stake here, the overarching contract, as Ms. Stentiford described it, and the payment will be made by Section 27, does that reference anything having to do with Pennsylvania?

A. It says, "Indianapolis, Indiana."

Q. Okay. Now, if you could look at what was marked today as Exhibit 24, which you discussed with Ms. Stentiford -- which are several government checks, correct? Made out to All Star Iron Works?

A. Correct.

Q. Now, were these four contracts, under the overarching contract Exhibit No. 22, were those four contracts the only government contracts that All Star Iron Works had in place and was working on with the U.S. Government during the time frame of 2000, 2001? Or did it have other government contracts that All Star was working on?

A. It had other contracts.
Q. Did All Star have contracts with the U.S. Navy?
A. At one time, yes, he did.
Q. And so if a check came in payable to All Star from the United States Government, was there any way that the government could tell which government contract that All Star was working on at that time that that particular check applied to?
A. Not from the check.
Q. And if as Ms. Stentiford suggested, if the bank had placed a hold on all government checks coming in to Mr. Soto, in your mind, in your view, could that potentially have disrupted all kinds of other work that Mr. Soto was doing for the U.S. Government that had nothing to do with this assignment?
A. That's correct.
Q. And did you think -- as a banking officer, is that something the bank wants to do?
A. No. Particularly since we hadn't had any problems with him in the past.
Q. Let me show you what's been marked as Exhibit 1. I don't think you've been shown that today, Ms. Bellamy. If you could take a second look at that.
MS. STENTIFORD: I'll object, because it obviously exceeds the scope of my direction examination,

bank under this assignment? How much is the bank out of money?

A. I don't recall how much has been lost prior to what's still here on the books. But at a minimum, it's what's still left on the books, which is about $375,000.

Q. Okay. You testified earlier that at all times, once you got involved, at least, you were dealing with Lee Sullivan and you kept asking for an accounting, correct?

A. That's correct.

Q. And that you thought there was still money out on these contracts left to be paid?

A. That's correct.

Q. What led you to believe that?

A. Well, I knew that there were some monies left, just from what Mr. Soto was telling me the amounts of the contracts were -- were for. But in addition to that, once I -- once I renegotiated the contract with Mr. Sullivan for $358,000, which were -- he decided that he was going to renegotiate so that we wouldn't have any of the problems with all the change orders and trying to get approval for what each of those change orders was worth, we were going to have one set fixed contract. And since all these contracts had started at the same time, they're all in the same proximity here in the Rio Grande Valley, they were all to build canopies at the port of entrance

here with the Mexican border, you would assume that the prices for all those would be the same. And the amounts that ended up being on those contracts with change orders was in the $200,000 range for three of them and this one for -- and it's B&M, I guess it is, is $358,000. All three of those other jobs were completed. Actually, all four of those jobs have been completed. And the amount of monies that the contracts say they're worth, although I don't know how much has been paid, but the amount of monies that those contracts say they're worth is in the neighborhood of -- for the three, $620,000, whereas one was worth $348,000 -- or $358,000. If you would just take $300,000 for the others, you would have $900,000 versus the $600,000. But if you take the $358,000, why wouldn't you take that? They're the same jobs, all under the same contract originally.

Q. The bottom line here is these contracts which originally started out and which you thought was $400,000 evolved into something that was approaching a million dollars or more?

A. Well, if you would have done $358,000 times four, it would have been in excess of a million dollars.

Q. Again, just so that the record is clear here, the government never provided the bank any of this information about the change orders?

A. No.
Q. Nor did the government ever provide the bank, even though the bank requested several times, an accounting as to payments made or to be made in the future?
A. That's correct.
Q. And finally, the name of the bank, Texas National Bank is the name today, correct?
A. That's correct.
Q. But in 2001, the name of the bank was Mercedes National Bank?
A. Correct.
Q. So if there's a document that has been produced by the government purporting to be a payment made to Texas National Bank in 2001, the name of the bank was actually Mercedes National Bank at that time in 2001, correct?
A. Correct.
Q. Okay.
MR. SNYDER: No further questions.

F U R T H E R   E X A M I N A T I O N

BY MS. STENTIFORD:
Q. I'm going to ask you to look again back at Exhibit 22. That's the partial excerpt from --
A. 22?
MR. SNYDER: Here.

series of questions about all the information that you had requested from the government and the government never provided -- never provided you an accounting of this or that, how much was paid, how much was remaining to be paid. The fact is that All Star is the bank's customer, yes? All Star is a pretty substantial borrower from this bank?

A. Yes.

Q. So as a condition of continuing to lend Mr. Soto and his company money, couldn't the bank simply have requested that Mr. Soto have regular meetings with the bank or just require Mr. Soto to say whenever he received a payment? Couldn't the bank have taken that seemingly simple step to protect itself?

A. You have to understand that the damage was done. The money had already been loaned. The money was loaned up front. And we did. Believe me, I met with Mr. Soto so many times once I took over this. But there was no money to get at that point. It was like getting blood out of a turnip. There was no money coming in. The monies -- I got very little monies after that to apply on these jobs. The work -- the monies had already been put out. So when I became aware of the problem, I did everything I could. There were all kinds of controls I put on there. That's why we have all the correspondence

A. It had other contracts.
Q. Did All Star have contracts with the U.S. Navy?
A. At one time, yes, he did.
Q. And so if a check came in payable to All Star from the United States Government, was there any way that the government could tell which government contract that All Star was working on at that time that that particular check applied to?
A. Not from the check.
Q. And if as Ms. Stentiford suggested, if the bank had placed a hold on all government checks coming in to Mr. Soto, in your mind, in your view, could that potentially have disrupted all kinds of other work that Mr. Soto was doing for the U.S. Government that had nothing to do with this assignment?
A. That's correct.
Q. And did you think -- as a banking officer, is that something the bank wants to do?
A. No. Particularly since we hadn't had any problems with him in the past.
Q. Let me show you what's been marked as Exhibit 1. I don't think you've been shown that today, Ms. Bellamy. If you could take a second look at that.
MS. STENTIFORD: I'll object, because it obviously exceeds the scope of my direction examination,

# *ACE COURT REPORTING SERVICE*

***& Digital Videography***

***Statewide & Nationwide Scheduling***

***ORAL DEPOSITION OF***
***Aaron Gonzalez***
***Taken on March 25, 2008***

***Cause No. 07-00355C; Texas National Bank f/k/a Mercedes National Bank v. United States; in the United States Court of Federal Claims***

ORIGINAL

***Ace Court Reporting Service***
***& Digital Videography***
***Leideker Building***
***200 E. Cano***
***Edinburg, Texas 78539***
***Firm Registration No. 476***
***Expiration Date: 12/31/09***
***(956)380-1100***
***Fax: (866) 380-1135***
***www.acecourtreporting.com***
***info@acecourtreporting.com***

Q. So you don't know what the bank did with this assignment, who it sent copies of it to the with the government?
A. This particular assignment?
Q. Yes.
A. No.
Q. Have you seen this document before?
A. Yes.
Q. Do you remember the first time that you saw it, when that was?
A. Right around June of 2001.
Q. So June 2001 that was your first assignment -- I'm sorry, your first involvement with the assignment?
A. Yes.
Q. Okay.
A. Did you need this back.
Q. Just make a stack of them for the court reporter.
A. Was this part of it?
Q. Yes, it is.
(Exhibit marked for identification as Deposition Exhibit Number 3.)
Q (By Ms. Stentiford) Mr. Gonzalez, I'm showing you what's been marked Exhibit 3, and I know you just said your first involvement with the assignment was June of

you said you reviewed the file some time before?
A. Possibly a couple months before.
Q. Okay. And then you sent this letter on the 6th of June?
A. Yes.
Q. Why?
A. Why was the letter sent?
Q. Yes.
A. Because there was no evidence in the file or in our accounts that any checks had been made directly to the bank for any of these contracts.
Q. How did that come to your attention?
A. Again, I was basically in charge of overseeing the loan department and this became a problem, problem loan in terms of noncompliance with the assignment we had in place.
Q. Well, was the assignment that was made in January of 2000, was that done because All Star Iron Works was having difficulty making it's loan payments?
A. No. My understanding is that he had multiple contracts already with the government and based on the size of the bank and the size of the loan to this particular, or one borrower, it became necessary to take an assignment to assure the bank that the money was coming in here.

Q. So it would be more of a cash flow issue than ability to pay issue?
A. Correct.
Q. So at the time the assignment was made in January of 2000, the All Star loan was not considered a problem loan?
A. No, not in 2000.
Q. How did the bank monitor after the assignment was sent to the government, how did the bank monitor it, do you know?
A. Basically, just with, with invoices that he brought in to the bank for payment. We had no documentation from the government what checks belonged to what contracts that came in, so it was just on whatever he brought in.
Q. And you mean Mr. Soto when you say he?
A. Yes.
Q. And Mr. Soto he's the president of All Star?
A. Yes.
Q. So it was Mr. Soto's duty to bring copies of the invoices that he was sending to the government also to the bank?
A. By the most part, yes.
Q. Did he start doing that in January of 2000?
A. He was doing that before. He had several

contracts with the government before 2000 on a smaller scale, but he would bring us -- and I think the invoice, there's invoices possibly in your file where there's a percentage of work in place or percentage of completion of work in place.

Now, the ones I reviewed were not signed by the government, so we don't know for a fact they were complete to the stage that he represented at the time.

Q. All right. You said you reviewed the bank's file made a couple months before you sent this June 6, 2001 letter. What would have been in the letter, do you remember?

A. In terms of?

Q. The documents -- what documents did you review before you wrote this letter?

A. I would basically have reviewed the loan history and see why payments were not being made directly to the bank.

Q. Would the loan history include the assignment documents?

A. Yes.

Q. Can you tell me from January 14th, 2000, the date on Exhibit 2, the assignment document from All Star to the bank to June 6th, 2001 or maybe say April 6th a couple months before, what did the bank do with respect to

to the bank; is that correct?
A. Rephrase that.
Q. Well, when -- there were checks issued by the government directly to All Star --
A. Correct.
Q. -- after January 14th, 2000. And my question to you based on my review, it appears that those checks were for partial payments, progress payments on more than one contract?
A. That's correct.
Q. And in some cases, I believe this to be -- I'm asking you, I believe that some some cases the checks included payments on the assigned contracts and nonassigned contracts?
A. That's correct.
Q. The nonassigned contracts, those amounts would have been properly payable directly to All Star?
A. Yes.
Q. Okay. And is that why you suggested that the bank, the checks could be made payable to both parties, both the bank and All Star?
A. Again, I was making reference to the ones that were assigned to the bank --
Q. Okay.
A. -- so that we could be able to separate those --

A. Uh-huh.
Q. And there's some handwritting that says Falcon Damn next to 8199.90 figure and next to the $6746.50 figure. Do you see that?
A. Yes.
Q. Do you know whose handwriting that is?
A. No.
Q. Do you know what Falcon Dam is?
A. Yes. That was one of the contracts that he had.
(Short break taken at 10:38 a.m.)
(Deposition resumed at 10:46 a.m.)
Q (By Ms. Stentiford) Just before the break, Mr. Gonzalez, I had asked you about this handwritten notations on Exhibit 13.
A. Yes.
Q. The Falcon Dam notation and I believe you said that was another contract that All Star had with the government that was not part of the assignment, isn't it?
A. That's correct.
Q. And so this other 47,146.53 is there any way to tell from this document what that was paying for?
A. No.
Q. Can you look at the next two pages of Exhibit 13. What are they?
A. It's a blown up copy of the check itself and the

back side of the check, the last page.

Q. Okay. What, what is all the printing on the back side of the check? What does that tell you?

A. That it was deposited into his account here at Mercedes National Bank.

Q. Looks like February 15th, 2001?

A. Yes.

Q. All right. So just for purposes of argument, if this 47,146.43, the balance that's not identified with Falcon Dam and that was part of an assigned contract that's money the bank thinks it should have been paid to it as opposed to directly to All Star?

A. Yes.

Q. Does the bank have any way of tracking government checks when they come in? Are they treated any differently than any other checks?

A. No.

Q. Was there any process in view of the assignment, was there any process put in place to monitor checks that were received payable to All Star Iron Works?

A. Not to my knowledge.

Q. Does the bank ever monitor checks as they come in for any purpose?

A. We monitor some checks that come in with the agriculture loans because they have been assigned to the

banks, so the government sends them to the bank into the account, but they have a hold on them so the farmer cannot use them. So we monitor those when we find out from the government that they're coming in.

Q. But apparently this check from the government to All Star there was no hold on?

A. No.

Q. And as part of the bank's policy for handling assignments, the bank didn't put an internal hold on checks being payable to All Star Iron Works?

A. No.

Q. Would that have been possible?

A. Because there was multiple contracts, it would have been possible but not likely because he needed to pay subs with that money.

Q. So any money the bank would have put on hold for All Star, All Star wouldn't have had the ability to pay its subcontractors?

A. That's correct. That was a '98 contract. I have a breakdown of that check so the 47,000 was the '98.

Q. That's another document that --

A. Well, I think you have this, but the breakdown of that check indicates that the first two were under a 2000 contract and the 47 was under a '98 contract, so none of that was '99.

Q. All right. At this March 22nd meeting you learned apparently All Star had received partial payments, progress payments?

A. I was not sure on that.

Q. Okay.

A. What I was sure is that some of the work had been complete.

Q. Okay. And so being completed, would it be -- would it be fair statement that you concluded All Star was at least entitled to be paid for that?

A. Correct.

Q. And did you later determine that, in fact, it had been paid for that work?

A. I've never made that determination, no.

Q. If All Star had, in fact, received a progress payment for work completed under the four task orders that were in the assignment that money, those payments rightfully belong to the bank pursuant to the terms of the assignment, correct?

A. That's correct.

Q. So if it were determined that progress payments had been paid to All Star, the bank's conclusion would be that money really was rightfully the bank's?

A. Correct.

MS. STENTIFORD: Thank you, Mr. Gonzalez.

A. Yes.
Q. And again Ralph Lauder was not chairman of the board?
A. No.
Q. So you misspoke before when you said that Lauder & Associates was chairman of the board of Mercedes National Bank?
A. That's correct.
Q. Okay. On these four contracts we've been discussing subject to the assignment, the four contracts that are in issue, did the bank ever receive a single payment directed to the bank from the U.S. government?
A. No, not to my knowledge.
Q. Okay. And you had testified earlier that you served as a contracting officer when you were with the U.S. Department of Agriculture; is that correct?
A. That's correct.
Q. What was your function as a contract officer for the U.S. government?
A. Basically to act on behalf of the government and enter into contracts with bonafide contractors or services that the government was requesting or soliciting.
Q. So you would sign contracts on behalf of the contract got?
A. Yes.

previously in June that you had sent to him complaining about the lack of payment, correct?

A. That's correct.

Q. In the first paragraph Mr. Mynatt is informing you U.S. Customs does not have a contract or any obligation with any subcontractor or any bank. Do you see that?

A. Uh-huh.

Q. Was that true, sir, that the government did not have any contract or obligation with Mercedes National Bank?

A. In my opinion it was not true.

Q. Why is that?

A. Because we had him sign an assignment agreement.

Q. In fact, Mr. Mynatt is the one that signed the assignment, correct?

A. That's correct.

Q. Now, did you ever actually talk to Mr. Mynatt on the telephone?

A. Yes, I did.

Q. What was your -- what was the nature of those discussions? What did he tell you?

A. My recollection was that -- well, one of the reasons that we started to speak with Lee Sullivan is because Lee Sullivan was his supervisor, and I'm not going

to say he did not recall the assignment because I did send it to him when I did complain about the bank not receiving the payment, but I think he was indicating that the, that the fact that he signed it did not commit the government to make payments directly to the bank.

Q. That's was, what, Mr. Mynatt that told you?

A. That was my recollection, yes, and that's why we started to talk to his supervisor who was Lee Sullivan.

Q. And did you complain to Mr. Sullivan about the assignment?

A. Yes.

Q. And, in fact, I believe Exhibit 7 is the copy of the letter you sent to him where you actually sent the assignment to Mr. Sullivan?

A. Correct.

Q. What was Mr. Sullivan's recollection? Did he know about the assignment?

A. No.

Q. Was he surprised?

A. To a certain extent he was surprised that Mynatt had signed the agreement.

Q. Did Mr. Sullivan ever tell you that the government was not obligated under the assignment to send payments directly to the bank?

A. He never told me that, no.

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **TEXAS NATIONAL BANK f/k/a MERCEDES NATIONAL BANK** | § § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **NO. 07-00355C** |
| | § | **Judge Firestone** |
| **UNITED STATES** | § | |
| | § | |
| **Defendant.** | § | |

**DECLARATION OF CHERYL BELLAMY**

My name is Cheryl Bellamy. I have never been convicted of a crime involving moral turpitude and am qualified in all respects to make this Declaration. All the facts stated herein are within my personal knowledge and are true and correct.

1.

I am the former President of Texas National Bank f/k/a Mercedes National Bank (the "Bank"). I was the acting President of the Bank at the time of the occurrence of the events outlined herein, and was personally involved in overseeing and directing the Bank's activities with regard to the account with All Star, the Assignment at issue, and the dealings with the U.S. Customs Service as outlined in Plaintiff's Complaint, and therefore have personal knowledge of all facts described herein.

2.

I was involved in preparing and procuring from the Government the Notice of Assignment of the Contract TC-I-96-013 between All Star Iron Works ("All Star") and the Government in January 2000. At the time that this assignment occurred in January 2000, the Bank already had significant



RECEIVED TIME AUG. 26. 4:18PM

experience in obtaining acknowledgements of assignments of contracts from the Government, particularly for agricultural loans. We had obtained assignments of Government contracts many times prior to 2000 and had never had any of them denied as being invalid by the Government.

3.

In the case of the All Star assignment to the Bank of proceeds from Government contract TC-I-96-013, we followed the same procedures we had followed with other Government contracts. I had in my file at the Bank copies of the pertinent regulations regarding assignments, including the Assignment of Claims Act and Assignment of Contracts Act. 31 U.S.C. §3727, 41 U.S.C. §15. I personally reviewed those regulations as part of preparing the assignment with All Star and the Notice of Assignment. While these events occurred over eight (8) years ago, I remember reviewing the applicable regulations when, under my direction, the Notice of Assignment was sent to the Custom Service on or about January 14, 2000, and I specifically recall sending two (2) copies of the Notice of Assignment to Customs in Indianapolis specifically because of the requirement that one go to the contracting officer and another copy go to the disbursing officer.

4.

I also specifically remember attaching a copy of the actual Assignment to each of the two (2) copies of the Notice of Assignment because that was also required by the applicable regulations. Also, I would like to point out that the Notice of Assignment itself references that a copy of the actual Assignment is attached thereto, and if I wrote in the Notice that the Assignment was attached, then the Assignment was attached. Therefore I am confident that I did indeed attach a copy of the assignment between All Star and the Bank to the Notice of Assignment, and am confident that the Bank did indeed mail the Notice of Assignment to the disbursing officer at 6026 Lakeside Boulevard, Indianapolis, Indiana because the regulations required the Bank to do so. Unfortunately

there was no disbursing officer specifically named in the contract TC-I-96-013, so I believe that we simply mailed the copy for the disbursing officer to the same address in Indianapolis because that is what the contract said, and that is all the information we had.

5.

On January 24, 2000 the Customs Service's contracting officer, Mr. Mynatt, sent me a letter responding to my Notice of Assignment in which he informed me that he had forwarded the Notice of Assignment to the Customs Service's Office of Legal Counsel for said counsel's review and approval of the Notice of Assignment, and that Mynatt would only sign it once he had obtained said legal approval. Neither Mynatt nor anyone else from Customs ever told me at that time that (i) the actual Assignment between All Star and the Bank was not attached to the Notice even though the Notice referenced it as being attached; or (ii) that no copy of the notice had been sent to or received by the disbursing officer. Instead, a short time later (I don't remember whether it was a few weeks or a month) I received the Notice of Assignment back from Customs signed by Mynatt. Obviously, since Mynatt told me he would not sign the Notice until it had been reviewed and "vetted" by his legal counsel, I assumed that there was no issue with regard to the assignment, and I relied upon his signature as an indication that Customs' lawyers had reviewed and approved the Notice of Assignment, which meant to me that I had done everything properly and correctly in terms of providing the proper notification to the contracting and disbursing officer and attaching a copy of the actual Assignment to the Notice.

6.

Finally, I would like to point out that in June 2001, when the Bank found out that Defendant had been making payments directly to All Star in violation of the Assignment, I spoke to Mynatt's supervisor, Lee Sullivan, who at first told me over the telephone that the Bank had not completed the

Notice of Assignment properly. But then the Bank, via Aaron Gonzalez's letter dated June 11, 2001, sent Mr. Sullivan copies of everything that the Bank had sent to Customs back in January 2000 and after Sullivan received and reviewed that documentation, Sullivan called me and personally told me that the Bank had, in fact, completed the Notice of Assignment properly, and admitted that the Notice of Assignment was valid.

I hereby declare under penalty of perjury under the laws of the United States of America that all of the aforesaid is true and correct.

SIGNED THIS 26 day of August, 2008.

CHERYL BELLAMY



RECEIVED TIME AUG. 26. 4:18PM