**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **TEXAS NATIONAL BANK f/k/a MERCEDES NATIONAL BANK** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **VS.** | § | **NO. 07-00355C** |
| | § | **Judge Firestone** |
| **UNITED STATES** | § | |
| | § | |
| **Defendant.** | § | |

**PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Pursuant to Rule 56(h)(2) of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits Plaintiff's Proposed Findings of Uncontroverted Facts.

1. In January 2000, the Bank extended a loan to government contractor All Star Iron Works ("All Star") via a revolving line of credit to provide capital to All Star to finance its work on design/build contracts for the U.S. Customs Service to construct inspection stations on four (4) international bridges along the U.S.-Mexico border. See Deposition of Cheryl Bellamy ("Bellamy Depo.") at 11:5-16:7, attached hereto as Appendix ("App.") 2-7.
2. As collateral for this extension of credit, the Bank sought to perfect a lien on certain of All Star's accounts receivables, specifically the contract task orders from the Customs Service. *Id.* at 11:19-24; (App. 2). The task orders were all under prime contract TC-I-96-013 between All Star and U.S. Customs. *Id.*, at 16:22-18:3; (App. 7-9).
3. In order to secure its lien, on or about January 14, 2000 the Bank signed an Assignment agreement with All Star, whereby All Star assigned to the Bank all payments due to All Star from the Government on contract TC-I-96-013, and on that same date the Bank sent a Notice of Assignment (also signed by All Star) to U.S. Customs. *Id.*, at 18:7-19:3; (App. 9-10).

(The actual Assignment is attached to Defendant's PFUF at App. 011-012; the Notice of Assignment is attached to Defendant's PFUF at App. 013). The Bank sent two (2) copies of the Notice of Assignment to U.S. Customs at 6026 Lakeside Boulevard, Indianapolis, Indiana. *Id.* at 19:4-25; (App. 10).

4. The pertinent contract, TC-I-96-013, does not specifically list a contracting officer of disbursing officer by name. See Contract, attached to Defendant PFUF at App. 001. The Contract states that the Contract will be administered by U.S. Customs at 6026 Lakeside Boulevard, Indianapolis, Indiana, and that payments will be made by U.S. Customs at 6026 Lakeside Boulevard, Indianapolis, Indiana. *Id.*

5. At the time of the assignment with All Star, the Bank had experience with assignments of government contracts, having made assignments with the U.S. Government several times in the past. *Id.*, at 19:20-25; (App. 10). The Bank possessed the Government regulations on assignments and followed those regulations as far as providing the instant Notice of Assignment to the proper Government representatives. *Id.*, at 20:7-12; (App. 11); see also Declaration of Cheryl Bellamy, at ¶3, (App. 62).

6. Cheryl Bellamy, the President of the Bank in January 2000, has testified that she is confident that the Bank mailed the Notice of Assignment, along with a copy of the actual assignment, to the disbursing officer, by mailing it to the same address that was listed in the Contract, 6026 Lakeside Boulevard, Indianapolis, Indiana. Bellamy Dec., at ¶4, (App. 62).

7. In the case of the All Star Assignment, after sending the Notice of Assignment to the contracting officer at Customs, William Mynatt ("Mynatt"), the Bank received a response from Mynatt informing the Bank that he had forwarded the Notice of Assignment to Custom's legal counsel, and that once it was approved by said legal counsel, the Notice of

Assignment would be signed by Customs and returned to the Bank. Bellamy Depo., at 20:22-21:15; (App. 11-12). Thereafter the Notice was signed by Mynatt, which led Bellamy, as the President of the Bank, to believe that the Notice of Assignment had been properly approved by the Customs Service. *Id.*, at 21:10-22:2; (App. 12-13); see also Bellamy Dec., at ¶5, (App. 63).

8. After receiving the approval of the Assignment from U.S. Customs, the Bank began to advance money to All Star on its line of credit for the work to be performed on the international bridges. Bellamy Depo., at 22:20-23:18; (App. 13-14). The majority of the funds were most likely advanced during the first six months after the Assignment was made. *Id.*

9. Prior to June 6, 2001 Bellamy had never seen any checks written by the Government directly to All Star under the Contract TC-I-96-013. *Id.*, at 26:4-7; (App. 15). Shortly before June 2001, the Bank's examiners from the Office of the Comptroller of the Currency ("OCC") discovered during their audit of the Bank that the Government had been making payments directly to All Star. *Id.*, at 26:13-27:5; (App. 15-16). At that point, in June 2001, Bank Vice President Aaron Gonzalez ("Gonzalez") was assigned by the Bank to investigate the file. See Deposition of Aaron Gonzalez, at 12:9-14; (App. 49).

10. When asked during deposition to examine certain checks made to All Star by the Government and verify whether the backs of the checks indicated that they had been deposited into All Star's account at the Bank, Bellamy testified that she could not tell whether the alleged backs of the checks matched or corresponded to the front of the checks. Bellamy Depo., at 29:5-13; (App. 17). Bellamy also testified that it was impossible to

discern what jobs or contracts the Government checks corresponded to or what the checks were for. *Id.*, at 30:19-24; (App. 18).

11. During the same time period that Contract TC-I-96-013 was in place between the Government and All Star, All Star was performing other work for the Government under separate contracts that were not covered by the Assignment, including a contract with the U.S. Navy. Bellamy Depo., at 83:19-84:3; (App. 41-42); see also Gonzalez Depo., at 18:20-25; (App. 50). Thus if All Star received and deposited a check from the Government with the Bank, there was no way the Bank would be able to determine if that Government check pertained to Contract TC-I-96-013 or pertained to a different Government contract that was not covered by the Assignment. Bellamy Depo. at 84:4-9; (App. 42); see also Gonzalez Depo., at 19:8-15; (App. 51) (Bank had no way of knowing which Government check went with which contract). During deposition, Gonzalez was shown a copy of a Government check issued to All Star, and testified that there was no way of telling which contract that check pertained to. Gonzalez Depo., at 37:16-22; (App. 54).

12. Moreover, Gonzalez testified that in many instances, the Government mixed payments on several different contracts within the same check, such a single check written by the Government to All Star would cover payments arising out of several different contracts, including Contract TC-I-96-013. Gonzalez Depo., at 26:6-18; (App. 53).

13. Given that All Star had several other contracts in force with the Government at the same time as Contract TC-I-96-013, the Bank could not just place a "hold" on *all* Government checks being deposited into All Star's account at the Bank because such a "hold" could interfere with the other contracts and work All Star was performing under separate contracts with the Government. Bellamy at 84:10-20; (App. 42).

14. Bellamy testified that there was no way the Bank could monitor payments by the Government to All Star under Contract TC-I-96-013 because there was no way the Bank would know that payments were being made to All Star under the Contract unless someone (All Star or the Government) notified the Bank that payments under the Contract were coming in. *Id.*, at 30:6-12; 31:6-15; (App. 18-19); see also Gonzalez Depo., at 38:14-17; (App. 55) (the Bank had no way of tracking Government checks and did not treat them any differently then any other check deposited with the Bank). The Bank did not receive copies of All Star's requests for payment that it made to the Government. Bellamy Depo., at 39:25-40:1; (App. 26-27). The Bank did receive some progress reports from All Star, but the reports were only signed by All Star and had not been approved or signed off on by the Government. Bellamy Depo., at 71:21-25; (App. 35); see also Gonzalez Depo., at 20:6-8; (App. 52).

15. Bellamy also testified that there was a lot of confusion with respect to Contract TC-I-96-013, and it was very difficult to determine when All Star was going to get paid, and that there were times when All Star would submit a request for payment to the Government and it took 1½ years for the Government to pay All Star. Bellamy Depo., at 31:19-32:12; (App. 19-20); see also 72:8-75:9; (App. 36-39). This happened on several occasions. *Id.* Due to change orders by the Government, the Bank never knew what work was remaining to be performed on the Contract by All Star, and as a consequence, the Bank never knew what was remaining to be paid. *Id.* at 31:19-32:12; (App. 19-20). Since the Bank never received any evidence of payments being directly received by All Star from the Government, the Bank assumed that the Government still owed money to All Star. *Id.*

16. The Bank did not have any reason to monitor All Star's daily deposit activity in its account with the Bank. *Id.*, at 33:6-18; (App. 21). The Bank had never had any problems or issues with All Star before. *Id.*, at 84:19-20; (App. 42). All Star was just one customer of many, and was not even one of the Bank's largest customers. *Id*., at 36:21-22; 37:16-25; (App. 24-25). Bellamy testified that the Bank didn't take any additional protective measures because the Bank never got notice of any wrongful activity with respect to payments, and testified that the Bank relied on the fact that it had what it thought was a valid assignment authorized by the Government. *Id.*, at 36:16-37:12; (App. 24-25).

17. Bellamy testified that in her view the Contract got out of control due to all of the change orders issued by the Government to All Star and the Government's refusal to provide the Bank with an accounting of the monies paid and still owing on Contract TC-I-96-013. *Id.* at 34:17-36:5; (App. 22-24). The task order jobs under Contract TC-I-96-013 started out as being worth about $400,000, but ended up being worth more than $1 million due to all of the change orders. *Id.*, at 34:17-23; (App. 22). Neither the Government nor All Star ever provided any copies of the various change orders to the Bank. *Id.*, at 75:19-76:9; (App. 39-40); see also 87:23-88:1; (App. 44-45).

18. Bellamy testified that she tried on several occasions, in writing, to obtain an accounting from the Government to find out what was left to be paid on Contract TC-I-96-013 and never got any responses from the Government. *Id.* at 34:23-24; 35:21-36:1; 37:4-12 (App. 22-25); 86:6-88:6 (App. 43-45).

19. After the Bank found out, in June 2001, that the Government had been making payments directly to All Star, Bellamy got directly involved in discussions with the Government to resolve the problem. *Id.*, at 51:15-19; 52:3-25 (App. 28-29). Bellamy had conversations

with Mynatt's superior at Customs, Lee Sullivan, who informed Bellamy that he believed the Assignment had been done properly. *Id.*, at 52:13-25 (App. 29); Bellamy Dec., at ¶6, (App. 63-64); see also Gonzalez Depo., at 61:21-62:8 (App. 59-60)(Bank started talking with Sullivan because Sullivan was Mynatt's supervisor). Sullivan promised Bellamy that he would provide an accounting showing amounts still due to be paid under the Contract TC-I-96-013, but he never fulfilled that promise and never provided the Bank with the accounting. ] *Id.*

20. Bellamy was able to get Sullivan involved because Mynatt would never provide the Bank with copies of all of the change orders the Government had submitted to All Star on Contract TC-I-96-013. Bellamy Depo., at 54:14-55:6 (App. 30-31). When he got involved, Sullivan indicated to Bellamy that the reason he was taking over was because Mynatt "had dropped the ball", and that he had several jobs that he had not been able to monitor properly and that that was the reason that Contract TC-I-96-013 was in such a mess. *Id.* Despite all of the Bank's written requests for an accounting from the Government, no such accounting was ever provided to the Bank. *Id.*, at 76:19-24 (App. 40); see also 86:6-88:6 (App. 43-45).

21. By the time the Bank became of aware of the Government's direct payments to All Star in June 2001, the damage had already been done. *Id.*, at 92:15-25 (App. 46). That is because the Bank had already loaned the money to All Star, and all of the payments had already been made by the Government to All Star. *Id.*

22. By December 2002, the Bank still had not received a response from the Government providing an accounting showing how much money remained to be paid to All Star under Contract TC-I-96-013, and so the Bank went to the extreme of hiring a related party to make a Freedom of Information Act ("FOIA") request for documents from the Government. *Id.*, at

65:18-66:8 (App. 32-33). The Bank did the FIOA request in order to obtain the information on an accounting that it had been requesting from the Government since June 2001. *Id.* at 76:10-18 (App. 40).

23. After receiving the response by the Government to the FOIA request, Bellamy followed up once again with Customs to get more information on payments still owing on Contract TC-I-96-013. Bellamy dealt with a woman from Customs in Indianapolis who was put in charge of accounting on Contract TC-I-96-013, and even then Customs still could not provide the Bank with an accounting of what amounts remained due and owing under the Contract. *Id.*, at 68:9-23 (App. 34).

24. In the end, the Bank never received a single payment from the Government pursuant to the Assignment on Contract TC-I-96-013. Gonzalez Depo., at 59:9-13 (App. 58). Defendant has admitted to making over $600,000 in payments directly to All Star under the Contract. See DPFUF at ¶22, 25-26.

Respectfully submitted,

**CASTILLO SNYDER, P.C.**
Bank of America Plaza, Suite 1020
300 Convent Street
San Antonio, TX 78205
Telephone: (210) 630-4200
Facsimile: (210) 630-4210

By: s/Edward C. Snyder
EDWARD C. SNYDER
State Bar No. 00791699

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 27th day of August, 2008, Plaintiff's "Plaintiff's Proposed Finding of Uncontroverted Fact" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the court's electronic filing system. Parties may access this filing through the Court's system.

/s/Edward C. Snyder
EDWARD C. SNYDER