# In the United States Court of Federal Claims

### No. 07-355C
### (Filed: March 6, 2009)

```
* * * * * * * * * * * * * * * * * *     *
                                        *
TEXAS NATIONAL BANK f/k/a               *
MERCEDES NATIONAL                       *
BANK,                                   *
                                        *   Anti-Assignment Acts, 41 U.S.C. § 15 &
               Plaintiff,               *   31 U.S.C. § 3727; Recognition of
                                        *   Assignment; Statute of Limitations, 28
           v.                           *   U.S.C. § 2501; Accrual Suspension Rule.
                                        *
THE UNITED STATES,                      *
                                        *
               Defendant.               *
                                        *
* * * * * * * * * * * * * * * * * *     *
```

*Edward C. Snyder,* San Antonio, TX, for plaintiff.

*Joan M. Stentiford,* U.S. Department of Justice, Washington, DC, with whom were *Gregory G. Katsas,* Assistant Attorney General, and *Jean E. Davidson,* Director, for defendant. *Andrew Jones*, U.S. Customs and Border Protection, Indianapolis, IN, of counsel.

## **O P I N I O N**

_____

**FIRESTONE**, *Judge*.

Pending before the court is the motion of the United States ("government" or

"defendant") for summary judgment pursuant to Rule 56 of the Rules of the United States

Court of Federal Claims ("RCFC").  In this action, the plaintiff, Texas National Bank

("Texas National," "the bank," or "plaintiff"),[1] claims that All Star Iron Works ("All Star") assigned its rights to payment for work on a contract with the U.S. Customs Service, now Customs and Border Protection ("Customs" or "CBP"), to Texas National but that the government failed to make the payments to Texas National as required by the alleged assignment. There are two issues to be decided on summary judgment. First, the court must decide whether the government is bound by the alleged assignment to the plaintiff. Second, the court must decide whether portions of Texas National's claim are barred by the six-year statute of limitations set forth in 28 U.S.C. § 2501 (2000).

For the reasons set forth below, the court finds that genuine issues of material fact preclude summary judgment on the question of whether the government is bound by the alleged assignment. Specifically, there are disputed issues of fact as to whether the government waived the requirements of the Anti-Assignment Acts, 41 U.S.C. § 15 (2000) ("Assignment of Contracts Act") and 31 U.S.C. § 3727 (2000) ("Assignment of Claims Act"),[2] by assenting to the assignment. The court also finds that the statute of limitations

---

[1]Texas National was formerly known as Mercedes National Bank. To avoid confusion, the court will refer to the bank as Texas National throughout this Opinion.

[2]Specifically, the Assignment of Contracts Act provides that no interest in a federal contract may be transferred to a party outside the original contract, unless the assignee is a "bank, trust company, or other financing institution," the contract "provid[es] for payments aggregating $1,000 or more," 41 U.S.C. §§ 15(a)-(b), and the assignee files

written notice of the assignment together with a true copy of the instrument of the assignment with –

(A)     the contracting officer or the head of his department or agency;

in 28 U.S.C. § 2501 bars Texas National's claim to monies paid to All Star before June 6,

2001, six years before this case was filed on June 6, 2007.  Accordingly, the defendant's

motion for summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**.

## BACKGROUND

I.     **Facts**

The following facts are not disputed unless otherwise noted.  On June 26, 1996, All

Star was awarded an indefinite delivery/indefinite quantity ("ID/IQ") contract ("the

contract") with Customs to perform construction and repair jobs at various ports of entry

in Texas.  The Offer/Award Form stated that the contract would be "administered by"

> U.S. Customs Service
> Field Procurement Services Group
> 6026 Lakeside Boulevard
> Indianapolis, Indiana 46278

and that "payment w[ould] be made by"

> U.S. Customs Service
> National Finance Center

---

(B)     the surety or sureties upon the bond or bonds, if any, in connection with such
contract; and

(C)     the disbursing officer, if any, designated in such contract to make payment.

41 U.S.C. § 15(b)(3).  Similarly, the Assignment of Claims Act, which, as the name implies,
restricts the assignment of claims, indicates that its restrictions "do[] not apply to an assignment
to a financing institution of money due or to become due under a contract providing for payments
totaling at least $1,000 when," among other requirements, "the assignee files a written notice of
the assignment and a copy of the assignment with the contracting official or the head of the
agency, the surety on a bond on the contract, and any disbursing official for the contract."  31
U.S.C. § 3727(c)(3).

6026 Lakeside Boulevard
Indianapolis, Indiana 46278[.]

Def.'s App. 1.  On September 2, 1998 and July 8, 1999, All Star was awarded the four

delivery orders that are the subject of this lawsuit.[3]

In January 2000, Texas National extended a loan to All Star via a revolving line of

credit to provide capital to All Star to finance its work on the four Customs delivery

orders.  On or about January 14, 2000, Alejandro Soto, Jr. ("Mr. Soto"), a principal of All

Star, executed a document entitled "Assignment" purporting to assign its rights to payment

for work performed under the subject delivery orders to Texas National.  In a letter dated

January 14, 2000, entitled "Notice of Assignment" and addressed to "U.S. Customs

Service–RPC"[4] at 6026 Lakeside Boulevard, Indianapolis, Indiana, Cheryl Bellamy ("Ms.

Bellamy"), then-President/CEO of Texas National, stated:

> PLEASE TAKE NOTICE that monies due or to become due under the [four
> delivery orders under the contract] have been assigned to [Texas National] to
> the provisions of the Assignment of Claims Act . . . .
>
> A true copy of the instrument of assignment is attached hereto.

---

[3]Specifically, the four delivery orders involved construction and design/build work on the "customs canopies" at (1) the Brownsville Port of Entry, (2) Customs' Los Indios Bridge, (3) Customs' Los Tomates Bridge, and (4) the B&M Bridge.  Def.'s App. 3-10.

[4]According to the defendant, the Indianapolis field procurement office of CBP has been known by various designations, including "RPC" for "Regional Procurement Center," "FPSB" for "Field Procurement Services Branch," and "FPSG" for "Field Procurement Services Group." Def.'s Report Following Oral Arg. (Docket No. 40).  At the time of the contract and purported assignment at issue in this case, the field procurement office reported to a Chief Procurement Officer at CBP's Washington, DC headquarters – a separate chain of command from that of the National Finance Center (which included the Office of Finance), which reported to the Executive Director, Financial Operations, at CBP's Washington, DC headquarters.  Id.

Payments due or to become due under such contract should be made to the Assignee.

<u>Please return this letter signed by the person acknowledging receipt on behalf of the addressee to my attention.  A copy is enclosed for your records.</u>

Def.'s App. 13 (emphasis added) ("Notice of Assignment").  Though the Notice of Assignment indicated that a copy of the assignment instrument and a copy of the Notice of Assignment itself were enclosed, there is no written evidence of any copy of the assignment instrument or the Notice of Assignment being sent to Customs' National Finance Center in Indianapolis.[5]

---

[5]Ms. Bellamy filed a declaration in which she stated: "I specifically recall sending two (2) copies of the Notice of Assignment to Customs in Indianapolis specifically because of the requirement that one go to the contracting officer and another copy go to the disbursing officer." Bellamy Decl. ¶ 3.  Ms. Bellamy stated, "I also specifically remember attaching a copy of the actual Assignment to each of the two copies of the Notice of Assignment because that was also required by the applicable regulations."  <u>Id.</u> at ¶ 4.  Ms. Bellamy further stated that

> if I wrote in the Notice that the Assignment was attached then the Assignment was attached.  Therefore, I am confident that I did indeed attach a copy of the assignment between All Star and the Bank to the Notice of Assignment, and am confident that the Bank did indeed mail the Notice of Assignment to the disbursing officer at 6026 Lakeside Boulevard, Indianapolis, Indiana because the regulations required the Bank to do so.  Unfortunately, there was no disbursing officer specifically named in the contract . . . , so I believe that we simply mailed the copy for the disbursing officer to the same address in Indianapolis because that is what the contract said, and that is all the information we had.

<u>Id.</u>  The government has moved to strike Ms. Bellamy's declaration, arguing that it is inconsistent with her deposition testimony, in which she stated, "I really don't know if another copy was sent. . . . I really don't know what was done there."  <u>See</u> Pl.'s App. 10-11 (Bellamy Depo. at 19:22-23, 20:11-12).

The government submitted two declarations of Ronald H. Newman, the CBP Commercial Accounts Section Chief in the National Finance Center, Office of Finance, in Indianapolis, the first of which stated, "I have reviewed the documents under my custody and control and have not located any documents evidencing that All Star Iron Works assigned its claim in this matter to

At the bottom of the Notice of Assignment was a section entitled

"Authorized/Acknowledgment, U.S. Customs Service, RPC"

("Authorized/Acknowledgment"), which was signed by Mr. Soto of All Star and by

William Mynatt ("Mr. Mynatt"), the administrative contracting officer ("ACO"), for "U.S.

Customs." Id. In a letter to Ms. Bellamy dated January 24, 2000, Mr. Mynatt stated:

"Reference your request for acknowledgement of receipt for payments of Customs

contracts awarded to Alejandro Soto[,] Jr.  Please be advised the letter was forwarded to

the Customs Chief Counsel for review.  When legal approval is received the

acknowledgement will be signed and forwarded." Def.'s App. 15 (emphasis added).

Between March 1, 2000 and June 20, 2001, Customs made twelve payments by

U.S. Treasury check to All Star for task orders related to the ID/IQ contract.[6]  The

government does not dispute that some of the checks from the government to All Star

included payments for multiple jobs.  However, all of the subject checks from Customs to

All Star were deposited into All Star's account at Texas National.[7]  These twelve payments

---

the plaintiff." Def.'s App. 128-29 (Newman 1st Decl.).  The plaintiff objects to the admission of Mr. Newman's first declaration on the grounds that it contains statements that are conclusory, speculative, not based on personal knowledge, and premised on hearsay.  Pl.'s Resp. to Def.'s Proposed Findings of Uncontroverted Fact ("DPFUF") ¶ 7.

[6]Eleven of these were made prior to June 6, 2001, six years before the plaintiff brought suit in this court.  The twelfth, on June 20, 2001, was for $1,634.34.

[7]Texas National contends that the court should strike the copies of the U.S. Treasury checks, which bear the name "US Customs" and show that contract payments were made out to All Star and that All Star deposited the checks in its account at Texas National Bank.  The bank argues that the checks have not been properly authenticated and constitute hearsay.  Pl.'s Resp. to DPFUF ¶ 25.

from Customs to All Star totaled $487,847.24.

On March 22, 2001, Aaron Gonzalez ("Mr. Gonzalez"), Executive Vice-President of Texas National, visited the four construction sites related to the delivery orders that were the subject of the alleged assignment. The purpose of the visit was to investigate the progress of All Star's work. It is not disputed that, at that time, Texas National did not have actual knowledge that All Star was receiving payments for its work at the four sites. However, it is also not disputed that Mr. Gonzalez confirmed during his site visit that All Star had performed some of the work and was entitled to be paid for it.

Texas National apparently learned that All Star was receiving the payments subject to the alleged assignment as a result of an audit of the bank by the Office of the Comptroller of the Currency ("OCC") shortly before June 2001.[8] On June 6, 2001, Mr.

---

The government correctly responds that copies of U.S. Treasury checks are self-authenticating as domestic public documents bearing the signature of the Secretary of the Treasury acting in his official duties, pursuant to Federal Rule of Evidence ("FRE") 902(2) (2000). Moreover, the government correctly argues that Mr. Newman, who stated in his second declaration that the images of the checks contained in the appendix correspond to the checks in the Treasury Department's online records, Newman 2nd Decl. ¶¶ 3-5, is competent as the custodian of these records to authenticate these checks as business records of the government, which constitute an exception to the hearsay rule under FRE 803(6). Therefore, Texas National's objections to the admissibility of the subject checks are overruled. Texas National has not presented any evidence to place in doubt the fact that the subject checks were issued by the U.S. Treasury on behalf of Customs to All Star and that All Star deposited the checks into its account at Texas National Bank.

[8]Specifically, the plaintiff states:

The only evidence presented in this case as to when the Bank discovered facts that would have put it on notice of Defendant's non[-]compliance is the testimony of the Bank's representatives. [Ms.] Bellamy testified that around June 2001, the Bank's examiners from the [OCC] discovered during their audit of the Bank that the

Gonzalez sent a letter and an email message to Mr. Mynatt, referencing the four delivery

orders and the Notice of Assignment dated January 14, 2000.  Mr. Gonzalez stated:

> In [the Notice of Assignment] the government had agreed that all payments due
> or to become due on above contracts would be made to [Texas National].  We
> have seen copies of several checks that have been made directly to All Star Iron
> Works.  At a minimum, checks should be made jointly to our Bank.
>
> Please call us and inform us why this agreement has not been complied with.
> . . .
>
> We would like to know if your agency is paying some of the subcontractors
> directly.  This will definitely have an impact on how we structure any future
> advances.

Def.'s App. 69.

Mr. Mynatt sent an email message back to Mr. Gonzalez on June 11, 2001.  The

message did not mention the alleged assignment by name.  Instead, Mr. Mynatt stated that

"Customs does not have a contract or any obligation with any subcontractor that All Star

utilized or any bank that provides the contractor with services."  Def.'s App. 70 (emphasis

added).  However, Mr. Mynatt also stated that "[t]he undersigned agreed to mail progress

payments for some of the task orders to your bank as a courtesy to All Star."  Id. (emphasis

added).  Mr. Mynatt went on to state:

> The problem seems to be I changed the mailing address in my computers at
> Indianapolis, IN[.  H]owever[,] the finance office that mails the checks in

---

Government had been making payments directly to All Star.  PPFUF ¶ 9.  At that
point, in June 2001, Bank Vice President Aaron Gonzalez . . . was assigned by the
Bank to investigate the file.  Id.

Pl.'s Resp. at 23.

Pennsylvania did not change the address they have in their computer.

I will contact the finance office to assure that the mailing address is changed to match your bank address.

Id.

That same day, June 11, 2001, Mr. Gonzalez sent a letter asking Lee Sullivan, Mr.

Mynatt's superior at Customs, to look into the issue of the alleged assignment.  In

addition, on June 12, 2001, Mr. Gonzalez responded to Mr. Mynatt, stating:

Our files are presently being reviewed by OCC . . . , and All Star Iron Works is one of the files they have selected for review.

In our loan to All Star Iron Works, we tried to perfect our lien on [four] specific government contracts that All Star had with the government. . . . It was both the bank's and All Star's intent that checks be made jointly to the bank and All Star.  In the letter that we sent to your agency, you agreed to make the checks solely in the name of the bank.  This can be modified to include both the bank and All Star.

OCC wants us to assure them that the collateral for this loan is intact and that the bank does have a good handle on the application of proceeds that are paid to All Star.  We have a good relationship with All Star Iron Works and the owner does provide us with copies of checks issued by your department.

We would appreciate anything you can do to assist us in making sure that the checks are made jointly to our bank and All Star in the future.  This will give us better control of the funds and get us in compliance with our original intent. It will also satisfy OCC with their findings.

I realize how a change of address can complicate issues.  Please contact me if further complications should occur.

Def.'s App. 72.

In a letter dated July 4, 2001, Mr. Mynatt responded to Mr. Gonzalez's June 12,

2001 letter.  Mr. Mynatt stated:

> Please be advised the reason progress payments for All Star . . . have not been forwarded to your bank is the Electronic Funds Transfer (EFT) information has not been provided to the United States Customs Service Accounts Services Division (ASD).
>
> Attached is a standard form 3881[9] with a pink cover sheet.  Please coordinate with All Star . . . and complete the Payee/Company Information and the Financial Institution Information blocks and sign the form and send to the ASD.

Def.'s App. 73.  Customs received a completed EFT Form 3881 from Texas National on July 20, 2001.  The form was signed by Ms. Bellamy as President of Texas National, listed All Star as the "Payee/Company," and directed Customs to transfer payments to All Star's account at Texas National.  Def.'s App. 74.  In completing Form 3881, Texas National did not identify itself as a payee or co-payee.  Rather, All Star was identified as the sole payee.

Because it routinely took up to ten days for a change in EFT information to take effect, Customs issued three payments totaling $43,010.81 to All Star by check on July 23, 2001, three days after receipt of the EFT form.[10]  After July 23, 2001, Customs began making payments for task orders related to the ID/IQ contract to All Star by EFT, in accordance with Texas National's Form 3881.  The EFT payments to All Star's account totaled $125,024.38.

---

[9]The Treasury Department uses the information from Form 3881 to transfer funds electronically to a specific bank account.

[10]Thus, the total amount of the payments by check to All Star was $530,858.05.

II.     **Proceedings to Date**

Texas National filed the present action on June 6, 2007.  Following discovery on the question of liability, the defendant moved for summary judgment.  In its motion, the government contends that Texas National failed to comply with the terms of the Anti-Assignment Acts – specifically, the Assignment of Contracts Act, 41 U.S.C. § 15, and the Assignment of Claims Act, 31 U.S.C. § 3727 – by failing to provide notice and a copy of the assignment to the disbursing officer in addition to the contracting officer.  The government further argues that it did not waive compliance with the Anti-Assignment Acts.  Finally, the government argues that even if Customs was bound by the assignment, Texas National's claims for payments made by the government to All Star before June 6, 2001 are barred by the six-year statute of limitations under 28 U.S.C. § 2501.  According to the government, Texas National's claims accrued each time Customs paid All Star in contravention of the alleged assignment, and therefore any of the bank's claims relating to payments made to All Star before June 6, 2001 are time-barred.

In response to the government's motion, Texas National contends that there are genuine issues of material fact that preclude summary judgment in this case.  First, the plaintiff argues, there are disputed issues of fact as to whether the bank complied with the Anti-Assignment Acts, based on the declaration of Ms. Bellamy, in which she stated that she "specifically recall[ed]" sending two copies of the Notice of Assignment and the assignment instrument to Customs in Indianapolis – one for the disbursing officer and one

for the contracting officer.  <u>See</u> Bellamy Decl. ¶¶ 3-4.  Second, the bank argues that, regardless of whether Ms. Bellamy sent copies of the Notice of Assignment and the assignment to the disbursing officer, there are disputed issues of fact as to whether the government recognized the assignment and waived the requirements of the Anti-Assignment Acts when it affirmatively acknowledged and signed off on the Notice of Assignment.  Finally, Texas National asserts that there are disputed issues of fact regarding whether the statute of limitations bars any portion of the bank's claim.  The bank argues that it has shown that it did not – and could not – discover the facts necessary to assert its claim until June 2001, as a result of the OCC audit, because it had no way of knowing that All Star was receiving payments from Customs under the subject delivery orders in contravention of the alleged assignment.  The bank contends that therefore, under the "accrual suspension" rule, accrual of its claims was suspended until June 2001.

Oral argument on the government's motion was heard on February 12, 2009.

## DISCUSSION

### I.    Standard of Review

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  RCFC 56(c)(1); <u>see also</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986); <u>Casitas Mun. Water Dist. v. United States</u>, 543 F.3d 1276, 1283 (Fed. Cir. 2008).  In considering a

motion for summary judgment, the court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 249. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986); Casitas Mun. Water Dist., 543 F.3d 1276, 1283 (Fed. Cir. 2008). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Liberty Lobby, 477 U.S. at 248. In addition, an issue of material fact is only genuine "if the evidence is such that a reasonable [finder of fact] could return a verdict for the nonmoving party." Id.

**II.    Genuine Issues of Material Fact Preclude Summary Judgment as to Whether the Government Waived Strict Compliance with the Anti-Assignment Acts by Recognizing the Alleged Assignment.**

**A.    The Plaintiff Did Not Comply with the Requirements of the Anti-Assignment Acts.**

The Assignment of Contracts Act, 41 U.S.C. § 15, provides that no interest in a federal contract may be transferred to a party outside the original contract, unless the assignee is a "bank, trust company, or other financing institution," the contract "provid[es] for payments aggregating $1,000 or more," 41 U.S.C. §§ 15(a)-(b), and the assignee files

> written notice of the assignment together with a true copy of the instrument of the assignment with –
>
> (A)    the contracting officer or the head of his department or agency;

(B)     the surety or sureties upon the bond or bonds, if any, in connection with such contract; and

(C)     the disbursing officer, if any, designated in such contract to make payment.

41 U.S.C. § 15(b)(3).  The Assignment of Claims Act contains similar notice requirements.  31 U.S.C. § 3727(c)(3).  The provisions of the Federal Acquisition Regulations ("FAR") further detail the manner in which a valid assignment may be secured.  See FAR Subpart 32.8 ("Assignment of Claims"), 48 C.F.R. §§ 32.800-32.806 (2000).  For example, under the FAR, the assignee must forward an original and three copies of the notice of assignment, together with one true copy of the instrument of assignment, to each of the following: (1) the contracting officer or agency head, (2) the surety on any bond applicable to the contract, and (3) "the disbursing officer designated in the contract to make payment."  FAR 32.805(b) (citing 32.802(e)).  The FAR also provides a "suggested format" for use by an assignee in providing the required notice, which includes the following language: "Please return to the undersigned the three enclosed copies of this notice . . . signed by the person acknowledging receipt on behalf of the addressee."  FAR 32.805(c).  The "suggested format" also includes a section entitled "Acknowledgement," which provides: "Receipt is acknowledged of the above notice and of a copy of the instrument of assignment," and provides blanks for the date and time received and for the signature and title of the person signing "[o]n behalf of" the addressee of the notice.  Id.

In its motion for summary judgment, the government contends that there is no evidence to show that Texas National provided the disbursing office designated in the contract – the "National Finance Center," listed as the office by which "payment will be made," Def.'s App. 1 – with a copy of the Notice of Assignment or the assignment instrument.  The government notes that, although the Notice of Assignment states that a copy of the assignment document was attached, no copy could be located in CBP's files despite a diligent search.  In addition, as noted above, the government has moved to strike Ms. Bellamy's declaration on the grounds that it is inconsistent with her deposition testimony.[11]  The government argues that, without any evidence to show that such copies were sent as required by the Anti-Assignment Acts, the government was not bound by the purported assignment.

Texas National argues in response that Ms. Bellamy stated in her declaration that she "specifically recall[ed]" sending two copies of the Notice of Assignment, each with a copy of the assignment instrument attached, to Customs in Indianapolis in order to comply with "the requirement that one [copy] go to the contracting officer and another copy go to the disbursing officer."  Bellamy Decl. ¶¶ 3-4.  Ms. Bellamy further stated that she was "confident" that she

> did indeed mail the Notice of Assignment to the disbursing officer at 6026 Lakeside Boulevard, Indianapolis, Indiana because the regulations required the Bank to do so.  Unfortunately, there was no disbursing officer specifically

---

[11]See footnote 5, supra.

named in the contract . . . , so I believe that we simply mailed the copy for the disbursing officer to the same address in Indianapolis because that is what the contract said, and that is all the information we had.

Id. at ¶ 4.

Texas National also argues that, regardless of whether copies of the Notice of Assignment and the assignment instrument were sent to the disbursing officer, the government waived compliance with the notice provisions of the Anti-Assignment Acts when the ACO, Mr. Mynatt, signed and returned the "Authorized/Acknowledgment" to Ms. Bellamy after obtaining "legal approval" from "the Customs Chief Counsel."  See Def.'s App. 15.

There is no dispute that the plaintiff has not put forth any evidence to corroborate the statements in Ms. Bellamy's declaration that Texas National sent copies of the Notice of Assignment and the assignment instrument to the disbursing office designated in the contract, as required by the Anti-Assignment Acts and the associated FAR provisions.  In addition, while Ms. Bellamy stated in her declaration that she is "confident that the Bank did indeed mail the Notice of Assignment to the disbursing officer," Bellamy Decl. ¶ 4, the government is correct that that statement is inconsistent with her prior deposition testimony, in which she stated, "I really don't know if another copy was sent."  Pl.'s App. 10 (Bellamy Depo. at 19:22-23).  In fact, in response to a direct question as to "whether the bank's policy in dealing with assignments of government contracts was to send notices to both the contracting officer and the disbursing officer," Ms. Bellamy stated in her

deposition, "I assume we followed the regulations.  But we did have copies of those, so I don't know – I really don't know what was done there."  Pl.'s App. 11 (Bellamy Depo. at 20:11-12).

"It is well settled that 'a conclusory statement on the ultimate issue does not create a genuine issue of fact.'" <u>Applied Companies v. United States</u>, 144 F.3d 1470, 1475 (Fed. Cir. 1998) (<u>quoting</u> <u>Imperial Tobacco Ltd. v. Philip Morris, Inc.</u>, 899 F.2d 1575, 1581 (Fed. Cir. 1990)) (finding that affidavit of plaintiff's Chief Financial Officer alone was "insufficient to create a genuine issue of material fact," "[i]n light of the strong documentary evidence supporting the government's contention . . . and the absence of evidentiary support for [the plaintiff's] argument").  As the Eleventh Circuit put it, "[w]hen a party has given clear answers [in a deposition] to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." <u>Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.</u>, 736 F.2d 656, 657 (11th Cir. 1984) (calling the affidavit in question "a sham").  Thus, the court finds that where, as here, there is no evidentiary support for Ms. Bellamy's assertion in her declaration that she sent copies of the Notice of Assignment and the assignment instrument to the disbursing office designated in the contract, and her declaration is inconsistent with her earlier deposition testimony, Ms. Bellamy's declaration cannot create a triable issue of fact as to compliance with the disbursing officer notice requirements.

Accordingly, the government is entitled to summary judgment on its contention that Texas National did not comply with the notice requirements of the Anti-Assignment Acts.

**B.      There Are Disputed Issues of Fact as to Whether the Government Waived Compliance with the Anti-Assignment Acts by Assenting to the Alleged Assignment.**

Although the court finds, as discussed above, that Texas National failed to raise any genuine issue of material fact with regard to its compliance with the Anti-Assignment Acts, the court finds a genuine issue of material fact as to whether the government waived the statutory requirements of the Anti-Assignment Acts by assenting to the assignment when Mr. Mynatt, the ACO, signed an "acknowledgement" of the assignment after receiving "legal approval" of the Notice of Assignment from Customs' Chief Counsel. See Def.'s App. 13, 15.

As noted above, in Mr. Mynatt's January 24, 2000 letter to Ms. Bellamy, sent in response to the Notice of Assignment dated January 14, 2000, Mr. Mynatt stated, "Reference your request for acknowledgement of receipt for payments of Customs contracts awarded to Alejandro Soto[,] Jr.  Please be advised the letter was forwarded to the Customs Chief Counsel for review.  When legal approval is received the acknowledgement will be signed and forwarded."  Def.'s App. 15 (emphasis added). Based on this letter, Texas National contends that the "Authorized/Acknowledgment" of the Notice of Assignment, signed by Mr. Mynatt, Def.'s App. 13, amounted to a clear assent to the assignment by the government.

-18-

In response, the government argues that Mr. Mynatt's letter and the returned

"Authorized/Acknowledgment" of the Notice of Assignment do not demonstrate that the

"meeting of the minds" necessary for a valid assignment took place between Texas

National and Customs.  The government contends that Customs never took any affirmative

steps to ratify or act in accordance with the alleged assignment and that later

correspondence between Mr. Mynatt and officers of Texas National does not reflect the

existence of any understanding with regard to the purported assignment.  The government

does not, however, dispute the inference from the January 24, 2000 letter together with the

signed "Authorized/Acknowledgment" that Customs' Chief Counsel gave the "legal

approval" sought by Mr. Mynatt, nor does the government dispute that Mr. Mynatt signed

and returned to Texas National the "Authorized/Acknowledgment" at the bottom of the

Notice of Assignment.  See Def.'s App. 13, 15.

There is a "long-recognized principle" that the government may, if it chooses to do

so, waive the provisions of the Anti-Assignment Acts and recognize an assignment.

Tuftco Corp. v. United States, 614 F.2d 740, 745 (Ct. Cl. 1980); see also D & H Distrib.

Co. v. United States, 102 F.3d 542, 546 (Fed. Cir. 1996) ("It is well established . . . that

the government can waive the statutory prohibitions against the assignment of contract

rights if the contracting officer gives clear assent to the assignment." (citing Tuftco, 614

F.2d at 745-46)).  "[I]n instances where the [g]overnment's course of conduct, its

statements to the parties and its dealings with the assignee indicate it acknowledges the

assignee as the contractor, recognition has been found." Tuftco, 614 F.2d at 745.  The

government's recognition of assignments may be established by "the totality of the

circumstances presented to the court," including the government's "knowledge, assent, and

action consistent with the terms of the assignments." Id. at 746.  The Anti-Assignment

Acts have been found to be waived "where the government has either affirmatively

acknowledged an assignment in writing or made payments consistent with the alleged

assignment." Banco Bilbao Vizcaya-Puerto Rico v. United States, 48 Fed. Cl. 29, 34

(2000) (citing Tuftco, 614 F.2d at 745, for the proposition that "the government had

waived the Act[s] where the contracting officer wrote 'Assignment acknowledged' at the

bottom of the notification letter from the assignor").

       In this case, drawing all justifiable inferences in favor of the plaintiff, see Liberty

Lobby, 477 U.S. at 255, the court finds a genuine issue of material fact as to whether the

government recognized the alleged assignment.  The undisputed inference to be drawn in

the plaintiff's favor from Mr. Mynatt's January 24, 2000 letter together with the signed

"Authorized/Acknowledgment" is that Customs' Chief Counsel gave the "legal approval"

sought by Mr. Mynatt.  In light of this apparent "legal approval" by Customs' Chief

Counsel, the "Authorized/Acknowledgment" signed and returned by Mr. Mynatt may be

more than simply acknowledgment of the ACO's receipt of the Notice of Assignment, as

the government argues.  Instead, based on the totality of the circumstances, the

"Authorized/Acknowledgement" may constitute an affirmative acknowledgment of the

assignment itself – a sufficiently "clear assent" to the assignment to establish recognition

of it by Customs.  See D & H Distrib., 102 F.3d at 546; see also Tuftco, 614 F.2d at 745

(finding waiver where, in the context of various other communications between the

contracting officer and the assignee and assignor, the contracting officer wrote

"Assignment acknowledged" at the bottom of the notification letter from the assignor);

Banco Bilbao, 48 Fed. Cl. at 34 (The Anti-Assignment Acts have been found to be waived

"where the government has . . . affirmatively acknowledged an assignment in writing.").

Therefore, viewing the evidence most favorably to the plaintiff, the court finds that there

are disputed issues of material fact which preclude summary judgment on the issue of

whether Customs assented to the assignment and waived strict compliance with the Anti-

Assignment Acts.[12]

### III.    The Plaintiff's Claims for Payments Made Before June 6, 2001 Are Barred by the Six-Year Statute of Limitations in 28 U.S.C. § 2501.

Ordinarily, claims in the United States Court of Federal Claims are barred unless

they are filed within six years after the claims first accrue.  28 U.S.C. § 2501 ("Every

claim of which the United States Court of Federal Claims has jurisdiction shall be barred

unless the petition thereon is filed within six years after such claim first accrues.").  A

---

[12]At oral argument, the government noted – and the plaintiff did not disagree – that, to the extent the plaintiff is able to show that a valid assignment existed in this case, if there is no explanation for Texas National's EFT Form 3881 instructing Customs to pay only All Star and not Texas National, see Def.'s App. 74, in all likelihood the government cannot be held liable for failing to pay Texas National after Texas National expressly directed Customs to pay All Star instead.

claim first accrues "as soon as all events have occurred that are necessary to enable the plaintiff to bring suit, i.e., when all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money." Martinez v. United States, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (en banc) (quotation omitted), cert. denied, 540 U.S. 117 (2004).

However, "[a]ccording to the accrual suspension rule, the accrual of a claim against the United States is suspended, for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed." Young v. United States, 529 F.3d 1380, 1384 (Fed. Cir. 2008) (quotation omitted). "To achieve such suspension the plaintiff must either show that the defendant has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was inherently unknowable at the accrual date." Id. (quotation omitted). The phrase "inherently unknowable" has been construed to mean that the factual basis for the claim is "incapable of detection by the wronged party through the exercise of reasonable diligence." Ramirez-Carlo v. United States, 496 F.3d 41, 47 (1st Cir. 2007).

In this case, despite the fact that All Star deposited all of the subject checks into its account at Texas National, the checks identified "US Customs" as the payor on their face, and an OCC audit of Texas National's records was able to determine that the payments on the subject delivery orders were going to All Star in contravention of the purported assignment, Texas National nonetheless argues that the bank had no way of discovering

the alleged injury before June 2001, after it found out as a result of the OCC audit. Because the plaintiff's claims were "inherently unknowable," the plaintiff argues, under the accrual suspension rule, its claims did not accrue until June 2001.

The court finds that the plaintiff's claims were not "inherently unknowable." To the contrary, the claims were completely capable of "detection by the [plaintiff] through the exercise of reasonable diligence," see Ramirez-Carlo, 496 F.3d at 47, and the plaintiff simply failed to exercise such diligence. The evidence in this case demonstrates that there were observable, objective facts available to put the bank on notice of its alleged injury, but the plaintiff failed to make reasonable inquiry into those facts. Specifically, the undisputed facts show that All Star deposited eleven U.S. Treasury checks amounting to $486,212.90 into its Texas National account between March 1, 2000 and June 6, 2001. As noted above, the checks identified U.S. Customs as the payor on their face. These checks were plainly available for inspection. Indeed, it was based on these same records that the OCC audit was able to determine that All Star appeared to be receiving payments from Customs on the subject delivery orders, in contravention of the purported assignment. The plaintiff has put forth no explanation as to why the discoveries made in the audit could not have been made earlier by the bank itself, by looking at its own records.

Notwithstanding the fact that the information necessary to discover the alleged injury was detectable to an outside auditor, the plaintiff failed to take reasonable steps to look into the matter. There is no evidence to show that Texas National made any inquiries

of All Star – Texas National's own customer – as to whether All Star was receiving payments from the government under the subject delivery orders, nor is there any evidence that Texas National monitored the federal checks deposited into All Star's account at the bank.  See Plaintiff's Proposed Finding of Uncontroverted Fact ¶ 9 ("Prior to June 6, 2001[, Ms.] Bellamy had never seen any checks written by the Government directly to All Star under the Contract . . . .").  This failure is particularly puzzling given the statement in Mr. Gonzalez's June 12, 2001 letter to Mr. Mynatt, in which he stated, "We have a good relationship with All Star Iron Works and the owner does provide us with copies of checks issued by your department."  Def.'s App. 72.  Similarly, Mr. Gonzalez conducted site visits to the four construction sites in March of 2001, which revealed that All Star had completed sufficient work to be entitled to payments, yet there is no evidence to show that Texas National took steps to determine whether All Star had in fact received any payment that the bank believed should have been paid to it.  Based on these undisputed facts, the bank's failure to make any inquires with regard to government payments that were being deposited into All Star's account at the bank constituted a per se failure to exercise reasonable diligence.

Thus, the court finds that Texas National has failed to identify a triable issue of fact as to its assertion that its claims did not accrue until June 2001.  The bank cannot rely upon the accrual suspension rule, as the undisputed evidence establishes that the alleged injury

was not "inherently unknowable."[13]  Instead, the court finds that Texas National's claim

for payment first accrued when the government sent its first check to All Star, and

thereafter, each check amounted to a new claim, accruing when the check was sent to All

Star.  See Martinez, 333 F.3d at 1303 (A claim first accrues "when all events have

occurred to fix the Government's alleged liability.").  Accordingly, the government is

entitled to summary judgment on its contention that the plaintiff's claims to payments

made by the government more than six years before June 6, 2007 are barred by the six-year

statute of limitations in 28 U.S.C. § 2501.

## CONCLUSION

For the reasons set forth above, the government's motion for summary judgment is

**GRANTED-IN-PART** and **DENIED-IN-PART**.  The parties shall file a joint status

report by **Friday, March 20, 2009**, proposing next steps for resolving this litigation.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

[13]The plaintiff in this case has not put forth any credible evidence that the government concealed its acts in any way.  See Young, 529 F.3d at 1384.  Though the plaintiff alleges (relying solely on the deposition testimony of Ms. Bellamy) that it attempted several times to obtain an accounting from the government regarding the subject contract, the court agrees with the government that the plaintiff has failed to put forth any documentation of the alleged inquiries, nor has it put forth any evidence regarding when the alleged inquiries took place.  Bald allegations of the government's failure to provide an accounting alone are not sufficient to establish a triable issue of fact regarding concealment, especially given that, as discussed above, the facts necessary to establish liability could have been discovered independently by the bank.